855 A.2d 291

**Vernon EVANS, Jr.**

v.

**STATE of Maryland.**

**No. 78 Sept. Term 2003.**

Court of Appeals of Maryland.

July 23, 2004.

Reconsideration Denied Sept. 10, 2004.

A. Stephen Hut, Jr. (Todd Zubler, Kalea Seitz Clark and Catherine M. Grosso of Wilmer, Cutler & Pickering; Jeffrey B. O'Toole and Julie S. Dietrich of O'Toole, Rothwell, Nassau & Steinbach, on brief), Washington, DC, for appellant.

Annabelle L. Lisic, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), Baltimore, for appellee.

Argued before BELL, C.J., RAKER, WILNER, HARRELL, BATTAGLIA, GREENE, JOHN C. ELDRIDGE, (Retired, specially assigned), JJ.

ELDRIDGE, Judge.

The appellant, Vernon Evans, Jr., admittedly participated in the contract murders of David Scott Piechowicz and Susan Kennedy on April 28, 1983, in the Warren House Motel located in Baltimore County, Maryland. Evans was convicted of first degree murder of both victims, and he is presently under sentences of death. This Court has, on eight prior occasions, rejected Evans's challenges to his prosecution, con-

victions, and sentences.[1]

In the present case, the ninth time he has been before this Court, Evans argues that he is entitled to a new sentencing hearing on either of two grounds. *First*, he contends that allegedly newly discovered evidence would show "that he was not the shooter and therefore not eligible for the death penalty." (Appellant's brief at 11). *Second*, Evans argues that the trial judge's application, at his sentencing hearing, of an amendment to the Maryland death penalty statute regarding mitigating circumstances, which amendment became effective a few months after the murders, violated the *ex post facto* clauses of the United States and Maryland constitutions.[2] We shall reject both of Evans's arguments.

---

1. *See Evans v. State*, 345 Md. 524, 693 A.2d 780, *cert. denied*, 522 U.S. 966, 118 S.Ct. 411, 139 L.Ed.2d 314 (1997); *Evans v. State*, 333 Md. 660, 637 A.2d 117, *cert. denied*, 513 U.S. 833, 115 S.Ct. 109, 130 L.Ed.2d 56 (1994); *Foster, Evans and Huffington v. State*, 305 Md. 306, 503 A.2d 1326, *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 722 (1986); *Evans v. State*, 304 Md. 487, 499 A.2d 1261 (1985), *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 722 (1986); *Evans v. State*, 301 Md. 45, 481 A.2d 1135 (1984), *cert. denied*, 470 U.S. 1034, 105 S.Ct. 1411, 84 L.Ed.2d 795 (1985). In addition, the Court denied, in unreported orders, applications by Evans for leave to appeal on December 14, 2001, December 16, 1999, and June 4, 1991.

   *See also Evans v. Smith*, 220 F.3d 306 (4th Cir.2000), *affirming Evans v. Smith*, 54 F.Supp.2d 503 (D.Md.1999), *cert. denied*, 532 U.S. 925, 121 S.Ct. 1367, 149 L.Ed.2d 294 (2001).

2. Article I, § 10, cl. 1 of the Constitution of the United States provides as follows:

   "No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility."
   Article 17 of the Maryland Declaration of Rights provides as follows:
   "**Article 17. Ex post facto laws; retrospective oaths or restrictions.**
   "That retrospective Laws, punishing acts committed before the existence of such Laws, and by them only declared criminal, are oppressive, unjust and incompatible with liberty; wherefore, no *ex post facto* Law ought to be made; nor any retrospective oath or restriction be imposed, or required."

## I.

Some basic facts underlying the prosecution were summarized by this Court in *Evans v. State*, 304 Md. 487, 494–496, 499 A.2d 1261, 1264–1265 (1985), *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 722 (1986), as follows:

"According to the State's evidence, the defendant Evans and Anthony Grandison entered into an agreement whereby Evans would kill David Scott Piechowicz and his wife, Cheryl, because the couple were scheduled to testify against Grandison in a narcotics case pending in the United States District Court for the District of Maryland. Evans was to receive $9,000.00 from Grandison for performing the murders.

"David Scott Piechowicz and Cheryl Piechowicz were employed at the Warren House Motel in Baltimore County. On April 28, 1983, Susan Kennedy, the sister of Cheryl Piechowicz, was working in place of Cheryl at the Warren House Motel. The evidence was sufficient to prove beyond a reasonable doubt that, on April 28th, Evans went to the motel and, not knowing the Piechowiczs, shot David Scott Piechowicz and Susan Kennedy with a MAC–11 machine pistol. Nineteen bullets were fired at the victims, who died from the multiple gunshot wounds.

"A two count indictment was filed against Evans and Grandison in the United States District Court. They were charged with violating the Piechowiczs' civil rights by interfering with their right to be witnesses in a judicial proceeding, in violation of 18 U.S.C. § 241, and with witness tampering, in violation of 18 U.S.C. § 1512.

"Subsequently the present case began with a four count indictment in the Circuit Court for Baltimore County, charging Evans and Grandison each with two counts of first degree murder, one count of conspiracy to commit murder, and use of a handgun in the commission of a felony or crime of violence. Upon the defendants' requests for removal, Grandison's trial was transferred to the Circuit Court for

Somerset County and Evans's trial was transferred to the Circuit Court for Worcester County.

"Prior to the trial in the instant case, Evans was convicted on the federal charges and sentenced to life plus ten years imprisonment. He then filed a pretrial motion to dismiss the charges in this case on double jeopardy grounds. The motion was denied by the trial judge, and this Court affirmed. *Evans v. State*, 301 Md. 45, 481 A.2d 1135 (1984), *cert. denied*, 470 U.S. 1034, 105 S.Ct. 1411, 84 L.Ed.2d 795 (1985).

"Thereafter the trial in the present case proceeded. Among the witnesses offering significant incriminating evidence against the defendant Evans were Janet Moore, Charlene Sparrow and Calvin Harper. Moore, Grandison's girlfriend, had been contacted by Grandison, who was then in the Baltimore City Jail, to assist in making arrangements for the murder of the witnesses. Sparrow was Evans's girlfriend and offered the most damaging testimony about the defendant's involvement as the killer. According to Sparrow, she had accompanied the defendant and Moore to the Baltimore City Jail where the latter two visited Grandison two days before the shooting, inspected the reception desk area of the Warren House Hotel, and reported to the defendant concerning the people working there and the presence or absence of security features. Sparrow testified that, at the request of the defendant and with his funds, she obtained a room at the motel, was with the defendant in the immediate area of the [Motel] at the time of the shooting, and wiped down the smoking MAC–11 machine pistol handed to her by the defendant immediately after the shooting. She related that the defendant told her that he would receive $9,000.00 'if he knocked both of them off.' Harper's testimony involved activities of April 26, 27 and 28, 1983, and included a description of the defendant's acquisition of the machine pistol from Rodney Kelly, as well as the defendant's statement that he liked the gun."

Additional factual detail was set forth by the United States Court of Appeals for the Fourth Circuit in *Evans v. Smith*,

220 F.3d 306, 310 (2000), *cert. denied,* 532 U.S. 925, 121 S.Ct. 1367, 149 L.Ed.2d 294 (2001), as follows:

"During the state trial, the prosecution offered overwhelming incriminating evidence against Evans through a number of witnesses. The most damaging testimony came from Charlene Sparrow, who was Evans' girlfriend at the time of the murders. Sparrow testified that she accompanied Evans and Janet Moore to the Baltimore City Jail two days before the shooting. At the jail, Evans and Moore met with Grandison, who was awaiting his federal drug trial. Sparrow then inspected the reception desk area of the Warren House Motel. She reported to Evans concerning the people working there and the presence or absence of security features. Sparrow also obtained a room at the motel with Evans' funds at his request. On the day of the murders, Evans told Sparrow to wait for him in the car behind the motel. Just before Evans walked to the motel, Sparrow looked inside the brown canvas bag he was carrying and saw a machine gun. Some ten to fifteen minutes later, Evans returned to the car, gave the smoking MAC–11 machine pistol to Sparrow, and asked her to wipe it down. Evans had also told her that he would receive $9,000 'if he knocked both of them off.' Evans and Sparrow went to the mall that night to spend part of the proceeds from the murders.

"Other witnesses also supplied incriminating testimony as to Evans' central role in the murders. For example, Moore testified as to her and Evans' visit to Grandison at the jail two days before the killings. Calvin Harper testified concerning the day of the murder and the two days leading up to it. Harper's testimony included a description of Evans' acquisition of the machine pistol used in the crime from Rodney Kelly and Evans' statement that he liked the gun. Several other witnesses were able to place Evans in the motel lobby during the time immediately preceding the murders. For example, Etta Horne, who worked at the motel, identified Evans as the man she saw sitting in the motel lobby shortly before the murders. Helen Kondilidis,

who had entered the motel shortly before the murders, also identified Evans as the man she saw sitting in the lobby."

In a proceeding under the Maryland Uniform Post Conviction Procedure Act, now codified as Maryland Code (2001), §§ 7–101 through 7–301 of the Criminal Procedure Article, the Circuit Court for Worcester County on March 28, 1991, vacated Evans's death sentences on the authority of *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and ordered a new capital sentencing proceeding. The Circuit Court refused, however, to vacate the guilty verdicts. This Court on June 4, 1991, denied both the State's and Evans's applications for leave to appeal.

Upon Evans's request for removal, the new sentencing proceeding was removed from the Circuit Court for Worcester County back to the Circuit Court for Baltimore County. At his resentencing hearing in 1992, Evans conceded that he was involved in the murders, although not as the "triggerman." During his allocution, "Evans apologized ... for causing pain to the victims' families, ... for being 'involved in this hideous crime,' ... and for allowing his drug-ridden life to twist him into 'the type of individual that would take two innocent lives'" (appellant's reply brief at 2). Evans's counsel at the 1992 sentencing hearing "conceded that the jury should check the box on the verdict sheet, indicating that Evans had been a principal in the first degree." Defense counsel "emphasized mitigation" and "argued that life imprisonment, rather than death, was the appropriate punishment." *Evans v. Smith*, 54 F.Supp.2d 503, 516 and n. 26 (D.Md.1999), *affirmed, Evans v. Smith, supra*, 220 F.3d 306.

At the conclusion of the 1992 resentencing proceeding, the jury determined again that Evans should receive two death sentences, and this Court affirmed. *Evans v. State*, 333 Md. 660, 637 A.2d 117, *cert. denied*, 513 U.S. 833, 115 S.Ct. 109, 130 L.Ed.2d 56 (1994).

The present case began when Evans filed in the Circuit Court for Baltimore County a motion for a new trial based on allegedly newly discovered evidence, pursuant to Maryland

Rule 4–331(c), and a separate motion to correct an illegal sentence, pursuant to Rule 4–345(a).[3] Hearings on the motions were held in April 2002 and December 2002. The Circuit Court filed on July 18, 2003, written opinions and orders denying the motions. Evans timely filed notices of appeal to this Court from each denial.

## II.

### A.

Generally under the Maryland death penalty statute, a "defendant found guilty of murder in the first degree may be sentenced to death only if," *inter alia*, "the defendant was a principal in the first degree...." Maryland Code (2002), § 2–202(a)(2)(i) of the Criminal Law Article.[4] There are two exceptions to this first degree principal limitation, one involving the murder of a law enforcement officer under certain

---

3. Rule 4–331(c) provides as follows:

"(c) **Newly discovered evidence.**—The court may grant a new trial or other appropriate relief on the ground of newly discovered evidence which could not have been discovered by due diligence in time to move for a new trial pursuant to section (a) of this Rule:

(1) on motion filed within one year after the date the court imposed sentence or the date it received a mandate issued by the Court of Appeals or the Court of Special Appeals, whichever is later;

(2) on motion filed at any time if a sentence of death was imposed and the newly discovered evidence, if proven, would show that the defendant is innocent of the capital crime of which the defendant was convicted or of an aggravating circumstance or other condition of eligibility for the death penalty actually found by the court or jury in imposing the death sentence;

(3) on motion filed at any time if the motion is based on DNA identification testing or other generally accepted scientific techniques the results of which, if proven, would show that the defendant is innocent of the crime of which the defendant was convicted."

Rule 4–345(a) states:

"**Rule 4–345. Sentencing–Revisory power of court.**

"(a) **Illegal sentence.** The court may correct an illegal sentence at any time."

4. Hereafter in this opinion, unless otherwise indicated, all references to the Maryland Code will be to the Criminal Law Article.

conditions (§§ 2–202(a)(2)(ii) and 2–303(g)(1)(i)), and the other involving a contract murder (§§ 2–202(a)(2)(i) and 2–303(g)(1)(vii)). The last cited sections make a first degree murderer eligible for the death penalty if "the defendant employed or engaged another to commit the murder and the murder was committed under an agreement or contract for remuneration or promise of remuneration." *See generally Grandison v. State*, 341 Md. 175, 670 A.2d 398 (1995), *cert. denied*, 519 U.S. 1027, 117 S.Ct. 581, 136 L.Ed.2d 512 (1996).

As earlier summarized, Charlene Sparrow, who was Evans's girlfriend, had testified that, on the afternoon of the murders, she was with Evans in a car outside of the Warren House Motel, that Sparrow saw a machine gun in a brown canvas bag in Evans's possession, that Evans walked into the Motel with the bag, that Evans returned to the car ten to fifteen minutes later and handed the MAC–11 machine gun to Sparrow, that the machine gun was smoking, and that Evans told Sparrow to wipe the gun down. Etta Horne, an employee at the Warren House Motel, had identified Evans and testified that he was the African–American male whom she saw in the Motel lobby shortly before the murders. Helen Kondilidis, who was employed at the restaurant in the Warren House Motel, testified that, after she had returned from a dental appointment and shortly before the murders, she spoke with Piechowicz and Kennedy for about 20 minutes in the lobby of the Motel. She also identified Evans as the man whom she saw in the lobby.

The "evidence" which Evans now claims is "newly discovered" would, according to Evans, impeach the testimony of Etta Horne and Helen Kondilidis identifying Evans as the African–American male in the Warren House Motel lobby shortly before the murders. Defense counsel's present theory, as indicated in his briefs and as more precisely delineated at oral argument before this Court, is that Evans participated in the murders but was not the "triggerman," that Evans took the bag with the MAC–11 machine gun from the car to the Motel, that Evans gave the gun to another African–American male at

the Motel,[5] that this associate entered the lobby and was the man seen in the lobby, that the associate shot the victims Scott Piechowicz and Susan Kennedy who were at the front desk in the lobby, that the shooter then gave the MAC–11 machine gun to Evans, and that Evans carried the smoking gun back to the car and gave it to Charlene Sparrow.

Evans maintains that, if the jury at a new sentencing hearing were to accept this theory, Evans would not be a principal in the first degree and would not be eligible for the death penalty under the Maryland statute.

At the April 2002 hearing on the motion for a new trial, Evans proffered a report of an interview with Janet Bannister by agents of the Federal Bureau of Investigation (FBI). The interview report was on an FBI form displaying the number 302, and such interview reports are referred to by the parties as "302 reports." The Bannister interview report had previously been proffered by Evans in a motion to re-open a post conviction proceeding based upon a *Brady* claim.[6] In addition, there was testimony that the report was contained in files available to Evans's attorneys since 1984. Evans also proffered at the April 2002 hearing transcripts of testimony by Janet Bannister, Roberta Weinstein, and Darece Pinkney.[7] This testimony had been given during earlier post conviction proceedings.[8]

---

**5.** Evans's counsel at oral argument before us, in explaining the theory after being questioned by the Court, did not indicate exactly where the alleged transfer of the gun from Evans to the confederate may have taken place. A diagram of the Motel's first floor, contained in the record, shows that there was a small foyer between the front entrance and the lobby.

**6.** *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), *affirming Brady v. State*, 226 Md. 422, 174 A.2d 167 (1961).

**7.** In the record and the several briefs, Ms. Pinkney's first name is variously spelled "Darece," "Derece," "Darese," and "Derese." For consistency, we shall use "Darece."

**8.** For a discussion of the Bannister, Weinstein, and Pinkney testimony, *see Evans v. Smith, supra*, 220 F.3d at 311, 317–319.

Apparently as a result of a request under the federal Freedom of Information Act, the FBI in June 2002 discovered ten additional 302 reports of interviews by FBI agents of persons who were in the vicinity of the Warren House Motel on the afternoon of April 28, 1983. The interviews occurred on April 28, 29, 30, and May 5, 1983, and each report was written the same day as the interview. The FBI turned these 302 reports over to the State, and the State immediately turned them over to Evans's attorneys. In July 2002, Evans's attorneys obtained an eleventh additional 302 report from the attorney for Anthony Grandison. This report was of an interview on April 29, 1983, and it was transcribed the same day.

After receiving the additional 302 reports in June and July 2002, Evans's attorneys requested that the hearing on his motions be reopened. A second hearing was held by the Circuit Court on December 3, 2002, at which the additional eleven 302 reports were presented. The 302 report of the interview with Janet Bannister as well as the testimony which had been given by Janet Bannister, Roberta Weinstein, and Darece Pinkney at earlier post conviction proceedings, contained descriptions of the sole African–American male who was seen in the lobby of the Warren House Motel on the afternoon of April 28, 1983, shortly before the murders. Evans's attorneys argued before the Circuit Court that these descriptions of the man in the lobby contradicted the identification of Evans by Etta Horne and Helen Kondilidis and demonstrated that the African–American male in the lobby was someone other than Evans. Therefore, the argument continued, this other man, and not Evans, was the principal in the first degree. Evans's attorneys further argued that some of the additional 302 reports undermined Horne's and Kondilidis's identification of Evans because the persons interviewed had not seen Horne or Kondilidis in the lobby.

In its opinion denying the motion for a new trial, the Circuit Court initially pointed out that the Janet Bannister 302 report and the transcripts of testimony by Janet Bannister, Roberta Weinstein, and Darece Pinkney, all submitted at the April

■■■■■■■■

2002 hearing, clearly did not constitute newly discovered evidence. Although the eleven additional 302 reports were in a sense deemed newly discovered, the Circuit Court indicated that the names of the persons interviewed and, for the most part, the substance of the reports had been known by Evans's attorneys, or had been available to them, for a long time. The Circuit Court analyzed each item proffered by Evans at the two hearings and held that the items did not constitute "newly discovered evidence which could not have been discovered by due diligence" within the meaning of Rule 4–331(c).[9] Alternatively, the court concluded that "none of the information ... contained [in the proffers] shows or tends to show ... that [Evans] was other than a principal in the first degree and guilty of grievous aggravating circumstances in [the] commission" of the two murders.

In this Court, Evans's counsel concedes that the "evidence" proffered at the April 2002 hearing, consisting of information provided by Janet Bannister, Roberta Weinstein, and Darece Pinkney, was "not 'newly discovered' under Rule 4–331...." (Appellant's brief at 1; appellant's reply brief at 11). Counsel for Evans argues, however, that the additional 302 reports presented at the December 2002 hearing did constitute "newly discovered" evidence under the Rule. Counsel contends that, in determining whether Evans should receive a new sentencing hearing based on newly discovered evidence, this Court should consider "the cumulative force of" Janet Bannister's, Roberta Weinstein's, and Darece Pinkney's testimony, which admittedly was not newly discovered, "together with the new 302 reports," which are claimed to be newly discovered. (Appellant's brief at 9).[10] Evans's counsel's argument is as follows (*id.* at 13, 174 A.2d 167):

---

9. *See* n. 3, *supra.*

10. Evans's present attorneys assert that the failure by Evans's previous counsel to present the testimony of Janet Bannister, Roberta Weinstein, and Darece Pinkney at Evans's original trial and sentencing proceeding, and at Evans's 1992 resentencing proceeding, was "because of negligence" and "because of blatant errors by Evans's counsel...."

"The Newly Discovered 302 Reports, in Combination with the Testimony of the Three Other Witnesses Never Before Heard by Any Jury, Create a Substantial and Significant Possibility that a New Jury Would Find that Evans Was Not the Shooter and Therefore Is Ineligible for the Death Penalty."

The State responds by arguing that the Circuit Court did not abuse its discretion in denying Evans's motion for a new trial and that the evidence proffered by Evans at the April and December 2002 hearings did not constitute "newly discovered evidence which could not have been [earlier] discovered by due diligence" within the meaning of Rule 4–331(c). Alternatively, the State contends that the allegedly newly discovered evidence does not "show that there is a substantial possibility that the [decision] of the fact finder would have been different" at the 1992 resentencing. (Appellee's brief at 36).

### B.

Preliminarily, we point out that Evans's motion for a new trial rests upon the underlying premise that a second degree principal "middleman" in a contract murder scheme is not eligible for the death penalty under the Maryland statute. Evans does not, by the allegedly newly discovered evidence, attempt to contradict the overwhelming evidence demonstrating that Grandison hired Evans, for $9,000.00, to commit the murders. Under Evans's current theory, Evans solicited an associate to do the actual shooting and handed the MAC–11 machine gun to the associate at the Motel. According to Evans, this other man then shot the two victims, handed the machine gun back to Evans, and Evans returned with the

(Appellant's brief at 9, n. 3, and 22). Evans's present counsel acknowledge that a constitutional "ineffective-assistance-of-counsel claim based [on] this [alleged] error" was not successful (*id.* at 9, n. 3). *See Evans v. Smith, supra,* 220 F.3d at 316–321. In the case at bar, during oral argument before this Court, the Court asked Evans's present counsel whether he was again making or renewing the ineffective assistance of counsel argument, and present counsel stated that he was not making such an argument.

smoking gun to the automobile where Charlene Sparrow was waiting. Under this scenario and Evans's view of the Maryland death penalty statute, Grandison would be eligible for the death penalty because he engaged Evans to commit the murders under a promise of remuneration, and Evans's associate would be eligible for the death penalty because he was the principal in the first degree, but Evans would not be eligible for the death penalty because he was not the initial hirer and he committed the murders as a principal in the second degree.

At oral argument, this Court raised the question as to whether the underlying premise for Evans's argument was legally sound. In other words, is the "middleman" in a contract murder scheme, who is not the employer initiating the scheme, and who is guilty of the murder as an aider and abettor, *i.e.*, as a principal in the second degree, eligible for the death penalty under the wording of the Maryland statute? An examination of the statutory language indicates that the premise for Evans's argument is reasonably debatable.

Under the Maryland death penalty statute, a death sentence cannot be imposed unless the State proves, beyond a reasonable doubt, that one or more of the statutorily enumerated aggravating circumstances exist. The statute, in § 2–303(g)(1) of the Criminal Law Article, sets forth ten "aggravating circumstances," although some of them cover alternative situations. The sixth and seventh aggravating circumstances are as follows:

"(vi) the defendant committed the murder under an agreement or contract for remuneration or promise of remuneration to commit the murder;

"(vii) the defendant employed or engaged another to commit the murder and the murder was committed under an agreement or contract for remuneration or promise of remuneration; . . . ."

Section 2–202(a) of the Criminal Law Article contains, *inter alia*, the first degree principal limitation. It provides in pertinent part as follows:

"(a) *Requirement for imposition.*—A defendant found guilty of murder in the first degree may be sentenced to death only if:

* * *

(2)(i) with respect to § 2–303(g) of this title, except for § 2–303(g)(1)(i) and (vii) of this title, the defendant was a principal in the first degree; . . . ."

As earlier discussed, the contract murder encompassed by § 2–203(g)(1)(vii) is an exception to the first degree principal requirement. If § 2–203(g)(1)(vi) were not in the statute, the language of § 2–203(g)(1)(vii) would clearly appear to cover the "middleman" in the contract murder scheme. Thus, after Grandison hired Evans for $9,000.00 to commit the murders, if Evans had engaged another person to be the "triggerman," and the other person had shot the victims, with Evans aiding and abetting the murders, such conduct by Evans would certainly seem to be embraced by paragraph (vii) if that paragraph stood alone. The problem is that paragraph (vi) is the specific aggravating circumstance covering those who "committed the murder" or murders "under an agreement or contract for remuneration." One may be guilty "of having committed a particular offense" even though he or she was not the principal in the first degree. *Jones v. State,* 302 Md. 153, 161, 486 A.2d 184, 188 (1985).[11] Moreover, unlike paragraph

11. Under Maryland law, one may commit an offense as either a principal in the first degree, or a principal in the second degree, or an accessory before the fact. With regard to felonies, Maryland case law draws substantive distinctions between principals and accessories, but normally it does not distinguish between principals in the first degree and principals in the second degree. *See, generally, e.g., State v. Sowell,* 353 Md. 713, 717–726, 728 A.2d 712, 714–719 (1999); *State v. Hawkins,* 326 Md. 270, 280–286, 604 A.2d 489, 494–497 (1992); *Sheppard v. State,* 312 Md. 118, 119–123, 538 A.2d 773, 773–775 (1988); *Osborne v. State,* 304 Md. 323, 332–335, 499 A.2d 170, 174–176 (1985); *Lewis v. State,* 285 Md. 705, 708–716, 404 A.2d 1073, 1074–1079 (1979); *State v. Ward,* 284 Md. 189, 191–192, 196–207, 396 A.2d 1041, 1043–1044, 1046–1052 (1978); *State v. Williamson,* 282 Md. 100, 382 A.2d 588 (1978); *Harvey v. State,* 111 Md.App. 401, 408–409, 681 A.2d 628, 631–632, *cert. denied,* 344 Md. 330, 686 A.2d 635 (1996).

(vii), paragraph (vi) is not listed in § 2–202(a)(2) as an exception to the first degree principal requirement.

Consequently, it is reasonably arguable that, under §§ 2–202(a)(2) and 2–203(g)(1)(vi) together, a principal who "committed the murder under an agreement or contract for remuneration" must have committed the murder as "a principal in the first degree" in order to be eligible for a death sentence.[12] In light of our conclusion in Part II C below, however, it is not necessary for us to decide this issue. We shall simply assume, *arguendo*, that Evans would not be eligible for the death penalty if he were a principal in the second degree.

## C.

■ The substantive standard governing the grant of a motion for a new trial under Rule 4–331(c) is whether the newly discovered evidence is sufficiently "material and persuasive such that '[t]he newly discovered evidence may well have produced a different result, that is, there was a substantial or significant possibility that the [decision] of the trier of fact would have been affected.' " *Campbell v. State,* 373 Md. 637, 666–667, 821 A.2d 1, 18 (2003), quoting *Yorke v. State,* 315 Md. 578, 588, 556 A.2d 230, 235 (1989). We fully agree with the Circuit Court and the State that the allegedly newly discovered evidence fails to create a substantial possibility that a jury would find that Evans was not the "triggerman." In affirming the denial of the new trial motion on this ground, we shall again assume, *arguendo*, that the eleven additional 302 reports submitted at the December 2002 hearing constituted "newly discovered evidence which could not have been [earlier] discovered by due diligence" within the meaning of Rule 4–331(c). We shall also assume, for purposes of this appeal, that we should consider "the cumulative force of" the eleven additional

---

12. The particular statutory provisions covering contract murders, and the principalship requirements in contract murder situations, have not changed in substance since the present Maryland death penalty statute was first enacted in 1978. *See* Maryland Code (1957, 1976 Repl.Vol., 1979 Cum.Supp.), Art. 27, §§ 413(d)(6), 413(d)(7), and 413(e)(1).

302 reports together with the "evidence" from Janet Bannister, Roberta Weinstein, and Darece Pinkney which was admittedly not "newly discovered."

The testimony and "newly discovered" statements now relied on by Evans to impeach the testimony of Etta Horne and Helen Kondilidis fall into two categories.

*First,* some of the testimony and one of the statements consist of descriptions of the African–American male seen in the Motel lobby or the vicinity of the Motel shortly before the murders, which differ from Etta Horne's and Helen Kondilidis's identification of Evans. The testimony of Roberta Weinstein, Janet Bannister, and Darece Pinkney, and the Bannister 302 report, fall into this category.

*Second,* several of the statements in the 302 reports are to the effect that, at various times between 2:45 p.m. and 3:15 p.m. on April 28, 1983, the witnesses saw no one in the Motel lobby except Piechowicz and Kennedy, or that the lobby was empty, or that Etta Horne and Helen Kondilidis were not in the lobby at the time when they had testified to being in the lobby. The 302 reports of statements by Hessie Hightower, Alan Summerfield, Mary Lefkowitz, Ruth Blatt, Evelyn Pushkin, and Marie Valle fall into this category and are relied upon by Evans as impeaching Etta Horne's and, more particularly, Helen Kondilidis's testimony.

The testimony and statements on which Evans now relies simply represent examples of the well-known phenomena that different witnesses' descriptions of a person or estimates of time will often vary to a considerable extent. *See, e.g., United States v. Wade,* 388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149, 1158 (1967) ("The vagaries of eyewitness identification are well-known"), and authorities there cited. The testimony and statements do not create a significant possibility that a jury would find that Evans was not the principal in the first degree.

Moreover, other courts have previously analyzed much of the "evidence" now relied on by Evans and have concluded that it was unpersuasive. For example, Evans relies heavily

on the testimony of Roberta Weinstein which described the gunman, and Darece Pinkney who lived two doors from the Motel and saw an African–American male run past her door. This testimony had previously been analyzed by the Circuit Court for Baltimore County, the United States District Court for the District of Maryland, and the United States Court of Appeals for the Fourth Circuit. The latter court reviewed the testimony as follows (*Evans v. Smith, supra*, 220 F.3d at 317, 319–320):

"Both Weinstein and Pinkney testified at Evans' second state post-conviction proceeding in 1996. Weinstein testified that, while working in her jewelry store in the Warren House, she heard a sound 'like glass crashing' and ran to the store window. She then saw the back and side of the gunman through the window from a distance of approximately thirty feet. She stated that she 'really could not see' the gunman's face and could not discern his race. Weinstein estimated the gunman's height as 5'7" or 5'8", whereas Evans is 5'2". Weinstein could not identify Evans as the shooter at a line-up shortly after the incident, and upon viewing Evans in the courtroom, she stated that the shooter was 'a lot taller.' She further stated that there may have been another person in the lobby at the time, but she was not sure and could not give any details about this possible individual.

"Pinkney testified that shortly after the shooting, while standing on her front porch about two doors down from the Warren House Motel, she 'saw a man just streak past [her] door,' from the direction of the motel. Pinkney stated that the individual was black and estimated the person's height to be about 5'8" or 5'9". Upon viewing Evans in the courtroom as he stood at counsel's table, she claimed that the individual she saw fleeing was 'much taller.' Weinstein and Pinkney each testified as well that the individual they saw was wearing a light-colored top and dark pants, whereas Sparrow stated that Evans had worn a suit to the motel that day. Both Weinstein and Pinkney gave statements prior to Evans' guilt/innocence trial, and both seemed to be

willing to testify at Evans' resentencing had they been called."

* * *

"As noted, the state's evidence against Evans on the question of principalship was simply overwhelming. The state presented testimony that Grandison had hired Evans to kill the Piechowiczs and that Evans stated he would receive $9,000 'if he knocked both of them off.' A number of witnesses placed Evans in the lobby near the time of the shootings. Sparrow testified that Evans carried a canvas bag with a gun in it to the motel shortly before the murders and was carrying the smoking machine pistol shortly after the murders. Chester [Evans's then attorney] herself acknowledged that Sparrow's testimony 'pretty much put the nails in our coffin because I couldn't seem to impeach her.' In addition, Harper testified as to Evans' acquisition of the gun from Kelly and Evans' statement that he liked the gun.

"Against this mountain of evidence, there is little possibility that the testimony of Weinstein and Pinkney would have made a difference. Weinstein estimated the gunman's height from a distance of thirty to thirty-five feet and was unable to see his face or discern his race. Further, the district court noted that Weinstein had overestimated the height of Scott Piechowicz by three to four inches, and her estimate of the gunman's height as 5'7" or 5'8" was based partly on her belief that Scott was 'a head taller' than the gunman. As for Pinkney, she did not see the shooting but merely described an individual who had suddenly 'streaked' past her front porch. Finally, even if counsel had presented this rather weak evidence, it likely would still have been in the context of what was primarily a mitigation strategy."

Evans also relies on the statements of Janet Bannister, which the United States Court of Appeals reviewed as follows (220 F.3d at 323):

"Evans' proffer of Bannister's testimony shows that such evidence would hardly undermine confidence in the juries'

conclusions. Bannister would essentially testify that shortly before the murders she saw a neatly dressed African-American man in the lobby who at one point stood next to her and whom she would estimate to be around 5'7"or 5'8". Bannister would also claim that there was a tan duffel bag near where the man had been seated and that she and Helen Kondilidis were not in the lobby at the same time. These inconclusive observations amount to little in light of the copious testimony that proves, *inter alia,* that Evans contracted with Grandison to murder the Piechowiczs; that Evans carried a gun of the same type used in the murders into the motel shortly before the shootings; that Evans was in the motel lobby shortly before the killings occurred; and that Evans was seen literally carrying a smoking gun very shortly after Kennedy and Piechowicz were gunned down."

The court below, in denying Evans's motion for a new trial, added the following with regard to Janet Bannister's statements:

"Janet Bannister did not witness the murders of Susan Kennedy and Scott Piechowicz on April 29, 1983.

"Janet Bannister does not know who was present in the lobby of the Warren House Hotel after she departed on April 29, 1983. * * *

"Janet Bannister was focused on clipping coupons and not the person standing next to her asking for change. * * *

"Janet Bannister believes Scott Piechowicz was as tall as six feet four inches (6'4"). Janet Bannister overestimated Scott Piechowicz's height by three to four inches despite knowing him for many years. * * *

"Janet Bannister believed the person asking for change to be from five feet five inches (5'5") to five feet eight inches (5'8"). * * * Ms. Bannister overestimated Scott Piechowicz's height by three to four inches. An overestimation of the person seeking change by three to four inches means that person was the approximate height of the Defendant.

"On October 20, 1999, Judge James T. Smith, Jr., in addressing the merits of the Janet Bannister information contained in the April 29, 1983 FBI Form 302 ruled:

'the alleged Janet Bannister statement is insufficient to support a reasonable probability that, had this evidence been disclosed to the defense, the result of the re-sentencing proceeding would have been different.' "

Evans relies on the 302 reports of interviews with Hessie Hightower and Alan Summerfield, each of whom stated that they passed through the Motel lobby at approximately 2:45 p.m. on April 28, 1983. Mrs. Hightower stated that the only person she then saw in the lobby was Scott Piechowicz, and Mr. Summerfield stated that "he did not notice anyone there." The 302 report of an interview with Mary Lefkowitz, also relied upon by Evans, recited that Mrs. Lefkowitz "left the Warren House [Motel] at approximately 2:50 p.m. [on April 28, 1983, and that there] was no one in the lobby of the Warren House."

The 302 report of an interview with Ruth Blatt, relied on by Evans, indicates that Mrs. Blatt arrived at the Needlepoint Shop in the Motel, adjacent to the lobby and front desk, "at approximately 2:15 p.m." on April 28, 1983, and that, after making her purchase, she left the Shop "between 3 and 3:15 p.m." Mrs. Blatt "advised that she did not recall seeing anyone in the lobby, nor did she observe anything that seemed unusual."

The 302 reports of interviews with Evelyn Pushkin and Marie Valle, both of whom were employed at the Village Beauty Salon located in the basement of the Warren House Motel, indicated that both women left the Beauty Salon together and separated in the Motel lobby, "at approximately 3:15 p.m." on April 28, 1983, with Pushkin exiting by the front door of the Motel and Valle exiting by the back door. Ms. Pushkin stated that she saw Susan Kennedy and Scott Piechowicz at the front desk but that otherwise "the lobby [was] empty." According to the Marie Valle 302 report, "Valle observed no one in the lobby of the Warren House. . . ."

Evans asserts that the above-summarized 302 reports "undermine" Etta Horne's and Helen Kondilidis's testimony, because the persons interviewed did not see Horne or Kondilidis in the lobby. (Appellant's brief at 15). In our view, however, the 302 reports neither impeach the testimony of Horne and Kondilidis nor show that the triggerman was an African–American male other than Evans.

Etta Horne had testified that she merely "stopped by the front desk" on her way upstairs, that the time was "about 2:45" on April 28, 1983, and that she saw Evans sitting in the lobby. Ms. Horne did not say how long she was at the front desk. Consequently, there was nothing inherently inconsistent between Etta Horne's testimony and the above-summarized statements that, at various moments between "approximately" 2:45 p.m. and 3:15 p.m., persons walking past the lobby did not see anyone in the lobby. Ms. Horne may have stopped at the front desk shortly before Mrs. Hightower and Mr. Summerfield passed through the lobby at "approximately" 2:45 p.m., or shortly after they passed through the lobby. Ms. Horne may have momentarily stopped by the front desk just before or just after Mrs. Lefkowitz left the Motel "at approximately 2:50 p.m."

Helen Kondilidis had testified that she went to the Warren House Motel at "approximately" or "right around 3:00" p.m. on April 28, 1983, that she spoke to Scott Piechowicz and Susan Kennedy who were at the front desk, that a man whom she identified as Evans was seated in the lobby, that she spoke to a woman named Harriet Friedman in the lobby, and that she was in the lobby "approximately" twenty minutes or "somewhere between twenty minutes and a half an hour."

Helen Kondilidis's testimony is entirely consistent with the statements by Hessie Hightower, Alan Summerfield, and Mary Lefkowitz, who said that they passed through the lobby at 2:45 p.m. and 2:50 p.m. on April 28, 1983. If Ruth Blatt walked past the lobby at 3:00 p.m., the initial time in her estimated time bracket, and Helen Kondilidis entered the

Motel a minute or so later, Mrs. Blatt would not have seen Helen Kondilidis.

The 302 report of the interview with Alan Summerfield also states that he returned to the Warren House Motel after the shooting and saw "Helen Ann," presumably Helen Kondilidis, in the downstairs restaurant. The 302 report then states: "She had been to the dentist at the time of the shooting." The report does not indicate the source of this statement, *i.e.,* whether it is surmise by the FBI agent or by Summerfield. The 302 report does not say that Helen Kondilidis told Alan Summerfield that she was at the dentist at the time of the shooting. Consequently, the report does little to impeach Helen Kondilidis's testimony.

Moreover, it is obvious that the "triggerman" was in the lobby shortly before the murders, yet none of the above-mentioned persons, whose interviews are summarized in the additional 302 reports, saw a man in the lobby other than Scott Piechowicz. They also did not purport to see anyone in the Motel foyer. In addition, some of these witnesses apparently did not see the victims in the lobby. If these persons walking past or through the lobby did not see the "triggerman," and if some did not even see the victims, it is entirely understandable that they would not have seen Etta Horne or Helen Kondilidis.

Evans uses the additional 302 reports primarily to challenge Helen Kondilidis's testimony. The court below pointed out, however, that "Helen Kondilidis told the first responding police officer that she had been in the lobby ten (10) minutes before the shooting and gave a description of an individual she saw in the lobby," that "Harriet Friedman saw Helen Kondilidis in the lobby of the Warren House approximately ten (10) to fifteen (15) minutes before the shooting," and that "Susan Kennedy told Helen Kondilidis that Janet Bannister had just been in the lobby asking for change." The Circuit Court also emphasized that Helen Kondilidis's identification of Evans as the person she saw in the lobby was corroborated by a great

deal of other evidence, including "the identification of Vernon Evans by Etta Horne."

It is undisputed, from Charlene Sparrow's testimony and Evans's admissions, that Evans was directly involved in the shooting, that shortly before the murders he carried the machine gun from the automobile into the Motel in a brown canvas bag, and that he later returned to the automobile with the smoking machine gun. There has never been any evidence of two African–American males being in, or in the immediate vicinity of, the Warren House Motel at or near the time of the shooting. In fact, there has never been a shred of evidence that anyone involved in the murders, other than Evans and Sparrow, was on the scene.

Evans's present argument is based upon a farfetched theory unsupported by any evidence. It rests entirely upon the well-known fact that eyewitness descriptions of an individual or estimates of time will likely vary. In our view, there is virtually no possibility that any jury would find that Evans was involved in the murders only as a principal in the second degree. The evidence that Evans was the "triggerman" is overwhelming.

## III.

We shall now turn to Evans's *ex post facto* argument.

### A.

As previously pointed out, the Maryland death penalty statute prohibits the imposition of a death sentence unless the prosecution proves, beyond a reasonable doubt, that one or more of the statutorily enumerated aggravating circumstances exist. In a capital sentencing proceeding, if the trier of facts unanimously finds that the prosecution has proven, beyond a reasonable doubt, the existence of one or more statutory aggravating circumstances, the fact-finder is then required to consider mitigating circumstances. Before addressing Evans's *ex post facto* argument, it is important to review the nature of "mitigating circumstances" under the Maryland

death penalty statute. Section 2–303(h)(2) of the statute provides:

"(2) If the court or jury finds beyond a reasonable doubt that one or more of the aggravating circumstances under subsection (g) of this section exist, it then shall consider whether any of the following mitigating circumstances exists based on a preponderance of the evidence:

(i) the defendant previously has not:

1. been found guilty of a crime of violence;

2. entered a guilty plea or a plea of nolo contendere to a charge of a crime of violence; or

3. received probation before judgment for a crime of violence;

(ii) the victim was a participant in the conduct of the defendant or consented to the act that caused the victim's death;

(iii) the defendant acted under substantial duress, domination, or provocation of another, but not so substantial as to constitute a complete defense to the prosecution;

(iv) the murder was committed while the capacity of the defendant to appreciate the criminality of the defendant's conduct or to conform that conduct to the requirements of law was substantially impaired due to emotional disturbance, mental disorder, or mental incapacity;

(v) the defendant was of a youthful age at the time of the murder;

(vi) the act of the defendant was not the sole proximate cause of the victim's death;

(vii) it is unlikely that the defendant will engage in further criminal activity that would be a continuing threat to society; or

(viii) any other fact that the court or jury specifically sets forth in writing as a mitigating circumstance in the case."

After the consideration of mitigating circumstances, the trier of facts next determines whether the aggravating circum-

stances outweigh whatever mitigating circumstances are found to exist. *See* § 2–303(i).

While the statutory language refers to the existence of mitigating circumstances "based on a preponderance of the evidence," it does not require that the defendant establish mitigating circumstances by a preponderance of the evidence. This Court has consistently construed the above-quoted language of § 2–303(h)(2) to mean only that the prosecution does not have the burden of disproving the existence of mitigation and that the defendant bears only a *risk* of nonproduction or nonpersuasion. The Court explained in *Foster v. State,* 304 Md. 439, 474–475, 499 A.2d 1236, 1254 (1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986), referring to its earlier decision in *Tichnell v. State,* 287 Md. 695, 730, 415 A.2d 830, 848 (1980), as follows (emphasis supplied):

> "We went on to point out, however, that as § [2–303(h)(2) ] 'does not require the prosecution to disprove the existence of mitigation,' it does place 'on the accused the *risk* of nonproduction and nonpersuasion.' ... Nevertheless, regardless of what evidence a defendant himself may or may not produce, or regardless of any mitigating argument he may or may not advance, if the jury perceives from the case a fact or circumstance concerning the crime or the defendant, which the jury deems to be mitigating, it may treat it as such. As to mitigation, it is only the *risk* of nonproduction or nonpersuasion which the defendant bears.
>
> "Moreover, § [2–303(h)(2)(viii)] includes as mitigating circumstances '[a]ny other facts which the jury or the court specifically sets forth in writing that it finds as mitigating circumstances in the case.' "

\* \* \*

> "Therefore, the defendant erroneously argues that 'if the defendant fails to meet his burden of proof and persuasion' concerning mitigating circumstances, death 'may be mandated where the sentencer is unconvinced that death is the appropriate punishment.' ... *A sentencing authority, un-*

*convinced that death is appropriate, may list as a mitigating circumstance whatever factor or factors may have led to this conclusion, irrespective of what the defendant produced or argued.* If the sentencing authority perceives anything relating to the defendant or the crime which causes it to believe that death may not be appropriate, it may treat such factor as a mitigating circumstance and decide that it outweighs the aggravating circumstances."

*See, also, e.g., Conyers v. State,* 354 Md. 132, 168, 729 A.2d 910, 929, *cert. denied,* 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999) ("It is important, and we strongly admonish trial judges, to explain to the jury that a § [2–303(h)(2)(viii) ] mitigating factor is anything relating to the defendant or the crime which causes it to believe that death may not be appropriate and to make clear that, in considering mitigating factors, the word 'evidence' as used in the sentencing form has a far broader meaning than just testimony and exhibits") (internal quotation marks omitted); *Bruce v. State,* 328 Md. 594, 620, 616 A.2d 392, 405 (1992), *cert. denied,* 508 U.S. 963, 113 S.Ct. 2936, 124 L.Ed.2d 686 (1993) ("As we indicated in *Foster,* the ability of the jury to consider *any* factor as a mitigator, not only those introduced by the defendant, is crucial to the non-mandatory character of the [Maryland] death penalty statute"); *Harris v. State,* 312 Md. 225, 254, 257, 539 A.2d 637, 651, 652 (1988) (" '[T]he content of a convicted defendant's allocution may be considered by the jury or court in mitigation. . . .' \* \* \* Harris is incorrect in insisting that he had, in the traditional sense, the 'burden of proof' as to mitigating circumstances. Although he had the risk of nonproduction and of nonpersuasion, a court could not have directed the jury to find against him on this issue, even if he produced no specific evidence at all, and even if he failed to argue it"); *Mills v. State,* 310 Md. 33, 55, 527 A.2d 3, 13 (1987), *vacated on other grounds,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) ("[A]s long as one juror perceives any factor relating to the crime or the defendant which he regards as a mitigating factor and which he believes is not outweighed by aggravating circumstances, the jury will not be able to

determine that the sentence shall be death. * * * [I]f a juror does not believe that death is the appropriate punishment, whatever factor relating to the crime or the defendant that led to such belief may be regarded by that juror as a mitigating circumstance not outweighed by aggravating circumstances").

The Maryland death penalty statute, in § 2–303(h)(2), contains seven short paragraphs setting forth mitigating circumstances, and an eighth paragraph encompassing "any other fact that the court or jury" views as a mitigating circumstance. There is one difference between those factors listed in the first seven paragraphs and the virtually limitless number of factors that may be encompassed by the eighth paragraph, although the difference is relatively small. As to the first seven factors, the Legislature has made a judgment that, if present, they should be regarded as mitigating. With regard to any factors proposed by the defense or by any juror to be considered under the eighth paragraph, it is for each juror to make the judgment of whether it should be regarded as mitigating. *See Foster v. State, supra,* 304 Md. at 482, 499 A.2d at 1258. With respect to the *existence* of a mitigating circumstance or the *weight* to be given that particular circumstance, however, there is no difference between mitigating circumstances under the first seven paragraphs and those under the eighth paragraph.

Prior to 1983, the fourth paragraph of mitigating factors read as follows (Maryland Code (1957, 1982 Repl.Vol.), Art. 27, § 413(g)(4), italics added):

> "The murder was committed while the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental incapacity, mental disorder, emotional disturbance, *or intoxication.*"

By Ch. 296 of the Acts of 1983, the Legislature deleted the above-italicized words "or intoxication" from the fourth paragraph and decided that intoxication should be considered in a capital sentencing proceeding under the eighth paragraph.

The Legislature set forth a "Preamble" to Ch. 296 as follows (II Laws of Maryland 1983 at 1045):

> "The General Assembly is aware that the Supreme Court has held that evidence of the intoxication of a defendant in a case involving the death penalty must be allowed and considered as a factor in mitigation. The General Assembly further believes that such mitigating factor should be considered under the eighth mitigating factor and not highlighted specifically so as to appear more as justification than as one of the many factors that may be considered as possible mitigation. In striking the word intoxication from the fourth mitigating factor, the General Assembly is not eliminating the consideration of intoxication, but altering the emphasis presently indicated. . . ."

Thus, the Legislature believed that a murder defendant's impaired capacity because of intoxication should be in a different category than impaired capacity caused by mental or emotional disorders. Nevertheless, the Legislature clearly did not intend to preclude consideration of intoxication as a mitigating circumstance.

Ch. 296 of the Acts of 1983 was passed by the General Assembly before Evans murdered Scott Piechowicz and Susan Kennedy on April 28, 1983. The effective date of Ch. 296, however, was July 1, 1983, after the murders took place.

At Evans's original sentencing proceeding in 1985, and at his resentencing proceeding in 1992, the trial judges instructed the juries concerning mitigating circumstances based on the statute as amended by Ch. 296 of the Acts of 1983. Evans did not object to these particular instructions; he raised no issue based on Ch. 296 in his two direct appeals; he raised no such issue in his state post conviction proceedings, and he did not raise the issue in his federal habeas corpus proceedings. In his present motion to correct an illegal sentence, Evans for the first time argues that the jury instruction based on Ch. 296 of the Acts of 1983, rather than an instruction based on the statute as it read prior to the 1983 amendment, was in violation of the *ex post facto clauses* of the federal and state

constitutions. Evans primarily relies on the Supreme Court's decision in *Carmell v. Texas*, 529 U.S. 513, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000).

## B.

The State argues that the *ex post facto* issue now presented by Evans does not relate to the legality of the sentence itself and, accordingly, may not properly be raised in a motion to correct an illegal sentence under Maryland Rule 4–345(a). The State also argues that, by failing to raise the issue previously, Evans has waived any objection to the jury instruction based upon the statute as amended by Ch. 296 of the Acts of 1983.

Evans replies that a jury instruction error such as allegedly occurred here, which, in his view, may have affected the jury's finding regarding intoxication as a mitigating factor, does relate to the legality of the sentence. (Appellant's reply brief at 16–18). Evans further argues that the failure to object to the instruction or to raise the issue previously does not result in a waiver because, under Rule 4–345(a), a "court may correct an illegal sentence at any time." (*Id.* at 18–19). *See, e.g., State v. Kanaras*, 357 Md. 170, 180, 742 A.2d 508, 514 (1999), quoting *Coles v. State*, 290 Md. 296, 303, 429 A.2d 1029, 1032 (1981) (" 'A trial court clearly has the authority and responsibility to correct an illegal sentence at any time, . . . and the refusal to do so, no matter when the correction request is made, is appealable.' "); *Walczak v. State*, 302 Md. 422, 427, 488 A.2d 949, 951 (1985) ("[A] defendant who fails to object to the imposition of an illegal sentence does not waive forever his right to challenge that sentence").

The State correctly argues that, as a general rule, a Rule 4–345(a) motion to correct an illegal sentence is not appropriate where the alleged illegality "did not inhere in [the defendant's] sentence." *State v. Kanaras, supra*, 357 Md. at 185, 742 A.2d at 517. A motion to correct an illegal sentence ordinarily can be granted only where there is some illegality in the sentence itself or where no sentence should have been

imposed. *See, e.g., Ridgeway v. State*, 369 Md. 165, 171, 797 A.2d 1287, 1290 (2002); *Holmes v. State*, 362 Md. 190, 763 A.2d 737 (2000); *Moosavi v. State*, 355 Md. 651, 662–663, 736 A.2d 285, 291 (1999). On the other hand, a trial court error during the sentencing proceeding is not ordinarily cognizable under Rule 4–345(a) where the resulting sentence or sanction is itself lawful. *Randall Book Corp. v. State*, 316 Md. 315, 323, 558 A.2d 715, 719 (1989) ("[W]hile improper motivation may justify vacation of the sentence, it does not render the sentence illegal within the meaning of Rule 4–345. Appellant did not raise this contention on direct appeal and may not do so here"). *See also Hill v. United States*, 368 U.S. 424, 430, 82 S.Ct. 468, 472, 7 L.Ed.2d 417, 422 (1962).

■ Nevertheless, this Court has appeared to recognize an exception to the above-summarized principles where, in a capital sentencing proceeding, an alleged error of constitutional dimension may have contributed to the death sentence, at least where the allegation of error is partly based upon a decision of the United States Supreme Court or of this Court rendered after the defendant's capital sentencing proceeding. *Oken v. State*, 378 Md. 179, 835 A.2d 1105 (2003), *cert. denied*, —— U.S. ——, 124 S.Ct. 2084, 158 L.Ed.2d 632 (2004), was a Rule 4–345 proceeding to correct an illegal or irregular sentence. The defendant Oken argued, relying on recent Supreme Court cases, that a constitutional error in the capital sentencing proceeding contributed to the death sentence. Section 2–303(i) of the Maryland death penalty statute provides that the trier of facts "shall determine by *a preponderance of the evidence* whether the aggravating circumstances under subsection (g) of this section outweigh the mitigating circumstances." (Emphasis added). In *Oken,* the case was presented to the sentencing jury under this "preponderance of the evidence" standard. The defendant Oken had raised no objection to this in the sentencing proceeding or in a prior post conviction proceeding. In the Rule 4–345 proceeding, however, Oken argued that the preponderance of the evidence standard violated due process and that a "beyond a reasonable doubt" standard was constitutionally required. This Court, in

the Rule 4–345 proceeding, resolved the merits of the constitutional issue, with the majority holding that application of the "preponderance of the evidence" standard was constitutional. *See also Oken v. State,* 367 Md. 191, 195, 786 A.2d 691, 693 (2001), *cert. denied,* 535 U.S. 1074, 122 S.Ct. 1953, 152 L.Ed.2d 855 (2002), where the Court decided the merits of a similar challenge by the defendant Oken.

Evans, like Oken, claims that a provision of the Maryland death penalty statute was unconstitutionally applied to him at his capital sentencing proceeding and that this alleged error may have resulted in the death sentence. Also, as in the *Oken* cases, Evans chiefly relies upon a United States Supreme Court opinion rendered after his 1992 capital sentencing proceeding, namely *Carmell v. Texas, supra,* 529 U.S. 513, 120 S.Ct. 1620, 146 L.Ed.2d 577. With regard to the availability of a proceeding under Rule 4–345(a), we perceive no significant differences between the *Oken* cases and the present case. Consequently, we shall decide the merits of Evans's *ex post facto* argument.

## C.

The leading opinion on the *Ex Post Facto* Clause of the United States Constitution is Justice Samuel Chase's opinion in *Calder v. Bull,* 3 Dall. 386, 1 L.Ed. 648 (1798).[13] Justice

---

13. This Court has stated that the *Ex Post Facto* Clause " 'in the Maryland Declaration of Rights ... has been viewed as having the same meaning as the federal prohibition.' " *Gluckstern v. Sutton,* 319 Md. 634, 665, 574 A.2d 898, 913, *cert. denied,* 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 331 (1990), quoting *Anderson v. Department of Health & Mental Hygiene,* 310 Md. 217, 223, 528 A.2d 904, 907 (1987), *cert. denied,* 485 U.S. 913, 108 S.Ct. 1088, 99 L.Ed.2d 247 (1988). *See also Booth v. State,* 327 Md. 142, 169 n. 9, 608 A.2d 162, 175 n. 9 (1992).

The Maryland Declaration of Rights was the first bill of rights to contain a constitutional prohibition against *ex post facto* laws. *Anderson,* 310 Md. at 223 n. 4, 528 A.2d at 907 n. 4; H.H. Walker Lewis, *The Maryland Constitution–1776,* at 45 (1976); 1 Bernard Schwartz, *The Bill of Rights: A Documentary History,* at 279 (N.Y. 1971). The Maryland Declaration of Rights was drafted in August 1776, on a motion by Samuel Chase made in the Maryland Constitutional Convention. It was drafted by a committee of seven which

Chase there stated (3 Dall. at 390, 1 L.Ed. at 650, emphasis in original):

"I will state *what laws* I consider *ex post facto laws,* within the *words* and the *intent* of the prohibition. 1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action.2d.   Every law that *aggravates* a *crime,* or makes it *greater* than it was, when committed.3d. Every law that *changes the punishment,* and inflicts a *greater punishment,* than the law annexed to the crime, when committed. 4th.   Every law that alters the *legal* rules of *evidence,* and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender.*"

The Supreme Court recently reaffirmed the continuing viability of Justice Chase's four categories of laws falling within the *ex post facto* prohibition, flatly rejecting the federal government's argument "that Justice Chase simply got it wrong with his four categories." *Carmell v. Texas, supra,* 529 U.S. at 535, 120 S.Ct. at 1634, 146 L.Ed.2d at 596.   Even more recently, the Court in *Stogner v. California,* 539 U.S. 607, 123 S.Ct. 2446, 2450, 156 L.Ed.2d 544 (2003), stated:

"[T]he kind of statute at issue falls literally within the categorical descriptions of *ex post facto* laws set forth by Justice Chase more than 200 years ago in *Calder v. Bull, supra,*—a categorization that this Court has recognized as providing an authoritative account of the scope of the *Ex Post Facto* Clause.   *Collins v. Youngblood,* 497 U.S. 37, 46, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990); *Carmell, supra,* at 539, 529 U.S. 513, 120 S.Ct. 1620, 146 L.Ed.2d 577."

The argument that the federal and state *ex post facto* clauses preclude the application of Ch. 296 of the Acts of 1983 to a capital sentencing proceeding occurring after 1983, but based on murders committed prior to July 1, 1983, was made

included Samuel Chase himself.   Schwartz, *supra,* at 279.   *See also Telnikoff v. Matusevitch,* 347 Md. 561, 585, 702 A.2d 230, 242 (1997).

and rejected by this Court in *Booth v. State,* 327 Md. 142, 168–176, 608 A.2d 162, 174–179 (1992). Booth argued as follows (Briefs, September Term 1991, No. 20, appellant's brief at 81):

"[C]h. 296 of the 1983 Laws 'alter[ed] the legal rules of evidence' so as to require the defense to produce more proof of mitigation in order to obtain a sentence of life imprisonment. . . . Before the enactment, a defendant received mitigating consideration on proof by a preponderance of evidence that his intoxication substantially impaired his capacity to appreciate the criminality of his conduct or conform his conduct to the requirement of the law. The effect of the enactment was to require him to prove this fact and, in addition, prove by a preponderance of evidence that it mitigated the crime."

In holding that the application of Ch. 296 did not violate the *ex post facto* prohibition, this Court in *Booth* emphasized that, "[b]oth before and after the 1983 amendment, the amount of weight to be given to intoxication as a mitigating circumstance turned on the judgment of each individual juror." 327 Md. at 169–170, 608 A.2d at 175. The *Booth* opinion went on to point out that the change created by Ch. 296 was only a relatively minor change in trial sentencing procedure, and that "[c]hanges in trial . . . procedure that had consequences far more disadvantageous to the defendant than the change in Maryland's [capital sentencing statute] have been held not to offend the *ex post facto* clause[s]," citing, *inter alia, Collins v. Youngblood,* 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990), and *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). *Booth,* 327 Md. at 170, 608 A.2d at 175.

The Court in *Booth* also distinguished our earlier holdings in *Gluckstern v. Sutton,* 319 Md. 634, 574 A.2d 898, *cert. denied,* 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 331 (1990), and *Anderson v. Department of Health and Mental Hygiene,* 310 Md. 217, 528 A.2d 904 (1987), *cert. denied,* 485 U.S. 913, 108 S.Ct. 1088, 99 L.Ed.2d 247 (1988), both of which had been relied on by the defendant. The *Booth* opinion stated that neither *Gluckstern* nor *Anderson* involved a change in trial procedure during the sentencing phase of a trial, and that both

of these earlier decisions "dealt with changes which had the effect of 'mak[ing] more burdensome the punishment for a crime,' " which was a violation of the *ex post facto* prohibition. *Booth,* 327 Md. at 175, 608 A.2d at 178.

In the case at bar, Evans argues that the application of Ch. 296 of the Acts of 1983 at the 1992 resentencing proceeding violated the *ex post facto* prohibition

> "because it imposed on Evans a new and more burdensome burden of proof. The Supreme Court made clear in *Carmell v. Texas,* 529 U.S. 513, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000), that such changes in the burden of proof are constitutionally prohibited; *Carmell* thus effectively overruled this Court's 1992 decision in *Booth* . . . ." (Appellant's brief at 33).

According to Evans, the change in sentencing procedure could not be applied to him because of the fourth category articulated in *Calder v. Bull, supra,* as explained by the Supreme Court in *Carmell v. Texas, supra.*

The Court in *Carmell v. Texas* reviewed a change in the Texas penal code concerning the evidence required for a conviction of certain sexual offenses committed against children under specified circumstances. Prior to September 1, 1993, Texas law provided that if the victim of certain sexual offenses was 14 years of age or older, and if the victim had not reported the alleged offense to another person within six months after the offense allegedly occurred, the victim's uncorroborated testimony could not support a criminal conviction. If such victim's testimony was not corroborated, the evidence was deemed insufficient to sustain a conviction, and the defendant was entitled to a judgment of acquittal. If, however, the victim was under 14 years of age, the defendant could be convicted on the victim's testimony alone. Effective September 1, 1993, Texas law was changed to raise the age from 14 to 18, so that corroboration of the victim's testimony was required only if the victim was 18 or older.

The defendant in *Carmell* was convicted, *inter alia,* of four charges of committing sexual offenses against his stepdaugh-

ter between June 1992 and July 1993, when the victim was 14 or 15 years old, with the convictions being based solely on the victim's testimony. The Texas courts applied the new statute to these charges, holding that the victim's testimony did not have to be corroborated and that retroactive application of the statutory change did not violate the *ex post facto* prohibition. The United States Supreme Court, however, reversed, holding that the federal constitution's *Ex Post Facto* Clause precluded application of the new statute to the offenses committed before its effective date.

The Supreme Court's *Carmell* opinion discussed the historical background of Justice Chase's fourth category of prohibited *ex post facto* laws and reaffirmed the vitality of the fourth category, saying (529 U.S. at 532–533, 120 S.Ct. at 1632–1633, 146 L.Ed.2d at 594):

"A law reducing the quantum of evidence required to convict an offender is as grossly unfair as, say, retrospectively eliminating an element of the offense, increasing the punishment for an existing offense, or lowering the burden of proof.... In each of these instances, the government subverts the presumption of innocence by reducing the number of elements it must prove to overcome that presumption; by threatening such severe punishment so as to induce a plea to a lesser offense or a lower sentence; or by making it easier to meet the threshold for overcoming the presumption. Reducing the quantum of evidence necessary to meet the burden of proof is simply another way of achieving the same end."

Later, the Court in *Carmell* summarized (529 U.S. at 551, 120 S.Ct. at 1642, 146 L.Ed.2d at 606):

"As for what *Calder* says, the fourth category applies to '[e]very law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.' 3 Dall., at 390, 1 L.Ed. 648 (emphasis deleted). The last six words are crucial. The relevant

question is whether the law affects the quantum of evidence required *to convict* . . . ." (Emphasis in original).

The Supreme Court reiterated that the fourth category of *Calder v. Bull* relates to "whether [prosecutors] have introduced a quantum of evidence sufficient to convict the offender." 529 U.S. at 551–552, 120 S.Ct. at 1643, 146 L.Ed.2d at 606.

■ In our view, *Carmell v. Texas* neither overrules *Booth v. State, supra,* 327 Md. at 168–176, 608 A.2d at 174–178, nor renders the fourth category of *Calder v. Bull* applicable to Ch. 296 of the Acts of 1983. The fourth category of *Calder v. Bull* and the holding of *Carmell* relate to changes in rules of *evidence* to facilitate a *conviction.* Such changes lessen the prosecution's burden of proof. As discussed in Part III A of this opinion, the change brought about by Ch. 296 did not affect the *evidence* to establish the existence of a mitigating circumstance, did not affect the *weight* to be given a mitigating circumstance, and did not alter the evidentiary burden of proof to establish any *fact.* As earlier pointed out, Ch. 296 changed nothing with regard to the existence of or weight to be given a mitigating circumstance.

The only modification brought about by Ch. 296 concerned a *judgment* as to whether a particular circumstance should be regarded as mitigating. Instead of the Legislature indicating its judgment that intoxication should be deemed mitigating, Ch. 296 provided that each juror should make that judgment. In the final analysis, however, there was no significant change regarding that judgment. Both before and after the enactment of Ch. 296, the judgment as to how much *weight* should be given the factor of intoxication belonged to the jurors.

Ch. 296 of the Acts of 1983 was not a "law that alters the *legal* rules of evidence, and receives less . . . testimony, than the law required at the time of the commission of the offence, *in order to* [decide against] *the offender." Calder v. Bull,* 3 Dall. at 390, 1 L.Ed. at 650. Consequently, the application of Ch. 296 to Evans's 1992 sentencing hearing did not violate the *ex post facto* prohibition.

*ORDERS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED.*