884 A.2d 694

**Kevin Eugene JACKSON**

v.

**STATE of Maryland.**

**No. 1215, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Oct. 6, 2005.

680

Julia Doyle Bernhardt (Nancy S. Forster, Public Defender, on brief), for appellant.

Steven L. Holcomb (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel SALMON, MEREDITH and CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

MOYLAN, J.

The critical question on this appeal is that of who—the trial judge or the appellate court—gets to determine whether newly discovered evidence, offered in support of a motion for a new trial, is weighty enough and credible enough to justify (from the trial judge's vantage point) or to compel (from the appellate vantage point) the awarding of a new trial. After the trial judge has said, "No," is there some mechanical appellate test for materiality that may override the trial judge's discretion, a discretion rooted in his sense or "feel" of the case over which he has presided? What does appellate deference really amount to? Does the "abuse of discretion" standard mean something more predictable than whatever the appellate court wants it to mean on a particular occasion? What are the limits that an appellate court may not transgress in finding an abuse of discretion?

## The Contentions

The appellant, Kevin Eugene Jackson, was convicted by a Somerset County jury, presided over by Judge Daniel M. Long, of two counts of sexual child abuse. In this appeal he contends

1. that Judge Long erroneously failed to grant his motion for a new trial;

2. that Judge Long erred in responding to two questions submitted by the jury in the course of its deliberations; and

3. that Judge Long, at the sentencing stage, erroneously considered 1) a hearsay statement by David Dunn contained in the Presentence Investigation Report and 2) a letter submitted to the court by David Dunn which had not been provided to the defense in advance of sentencing.

## Factual Background

The appellant and Kimberly Milbourne were married in 1992 and divorced in 1996. Their daughter, the victim of the sexual child abuse in this case, was born on April 4, 1992. Both the 1996 divorce and the ensuing custody fight over the daughter were, by mutual acknowledgment, "contentious" and "ugly." The court awarded the custody of the daughter to the mother and allowed the appellant visitation privileges on alternate weekends. Both the mother and the appellant re-married.

In 1999, the mother and her new husband moved to Virginia with the daughter in what they freely admitted was an attempt to thwart visitation by the appellant. For some extended period of time, the appellant had no meaningful visitation with his daughter. As a direct result of that situation, he retained counsel and filed 1) a petition to enforce visitation, 2) a petition to find the mother in contempt, and 3) a complaint asking for custody of his daughter. In the wake of those filings, the mother reported that her daughter had in March of 2002, just before her 10th birthday, revealed to her that the appellant had sexually abused her back when she was four or five years of age. Charges were filed, and the appellant was ultimately convicted of two counts of sexual child abuse.

## The Denial of the Motion for a New Trial

The most significant of the contentions before us is that Judge Long abused his discretion in denying the appellant's

Motion for a New Trial. At the outset of any review of whether a trial judge abused his discretion in denying a new trial motion, it is important to establish which party bears the burden of proof on the issue of whether a new trial should be awarded.

## The Burden of Proof On a Motion for New Trial

■ It always behooves us, on any issue, to identify which party bears the burden of proof. When the evidence and the argument at a hearing on a Motion for New Trial, for instance, are so frustratingly scant that the trial judge cannot arrive at a definitive conclusion one way or the other, how does he resolve his doubt? To wit, who wins and who loses the nothing-to-nothing tie? In law, of course, there are no ties, for we have deliberately created a device called the allocation of the burden of proof for the precise purpose of avoiding ties. That party to whom the burden of proof is allocated is, by definition, the loser of what would otherwise be a tie. At a hearing on a Motion for New Trial, the burden of persuading the trial judge that such a remedy is called for is on the defendant, as the moving party.

Writing for the Court of Appeals in *Argyrou v. State,* 349 Md. 587, 609, 709 A.2d 1194 (1998), Chief Judge Bell emphatically made this allocation of the burden clear:

> As the proponent of the new trial motion, the petitioner had the burden of establishing, among other things, that the confession was newly discovered evidence. *The petitioner simply failed to carry it.* Accordingly, the trial court did not abuse its discretion when it denied the petitioner's motion for new trial.

(Emphasis supplied). See also *Isley v. State,* 129 Md.App. 611, 673–74, 743 A.2d 772 (2000).

## Three Subcontentions That Defaulted

The guilty verdicts in this case were rendered on March 11, 2004. The Motion for a New Trial was filed on May 5. The first three grounds alleged in that motion were 1) that the evidence was legally insufficient to support the verdicts, 2)

that there was no evidence to corroborate the testimony of the victim, and 3) that the verdict was contrary to the weight of the evidence. Judge Long declined to entertain those three contentions, because the motion for a new trial had been filed well beyond the 10–day period set out in Maryland Rule 4–331(a), which provides:

(a) **Within Ten Days of Verdict.** On motion of the defendant filed within ten days after a verdict, the court, in the interest of justice, may order a new trial.

In *Love v. State,* 95 Md.App. 420, 426–28, 621 A.2d 910, *cert. denied,* 331 Md. 480, 628 A.2d 1067 (1993), this Court discussed the significance and the binding nature of that 10–day time limitation.

The Motion for New Trial in a criminal case, recognized by Md. Ann.Code art. 27, § 594 (1992), is controlled by the provisions of Maryland Rule 4–331. The Motion is available on three progressively narrower sets of grounds but over the course of three progressively longer time periods. *The shortest of time periods but the broadest of predicates is that provided by subsection (a):*

. . . .

*The list of possible grounds for the granting of a new trial* by the trial judge within ten days of the verdict *is virtually open-ended.* . . .

. . . This broader latitude is in keeping with the provision of subsection (a) that a judge may order a new trial "in the interest of justice."

*This broad base for awarding a new trial is tightly circumscribed by the timeliness requirement that the motion be filed "within ten days after a verdict."* . . . *Trial judges, moreover, are not empowered to overlook the filing deadline.*

(Emphasis supplied).

Judge Long, therefore, properly declined to hear the three contentions that could only have been legitimately considered if they had been timely raised within ten days of the verdicts.

They clearly had not been so timely raised. As we observed in *Love v. State,* 95 Md.App. at 423, 621 A.2d 910:

> *The Motion for New Trial* is one of the post-trial remedies. It *is by no means,* however, *a never-failing panacea, available whenever and however outraged justice may beckon.* It is designed to correct some, but not all, flaws that may have marred a trial. *It is limited, moreover, by rigid filing deadlines and other formal constraints.*

(Emphasis supplied).

## When Is Due Diligence Due?

The appellant, however, also raised a fourth ground for his motion. It was that of newly discovered evidence. The motion alleged:

> 6. *Additionally, there is now new evidence,* which could not have been discovered by due diligence prior to trial. Specifically, *the victim has now recanted her testimony that she was abused by the Defendant. She recanted her testimony the day after the trial* to another family member.

> 7. The day after the trial, the victim stated that her mother and stepfather forced her to testify against her father. She also stated that she did not know that her father would go to jail if convicted.

> 8. It is now clear that the witness/victim has either been threatened or coached by her mother and stepfather.

(Emphasis supplied).

Of the three time periods for filing a Motion for New Trial under Rule 4–331, the narrowest in terms of its justiciable subject matter but the most generous in terms of its filing deadline is subsection (c), which provides, in pertinent part:

> (c) **Newly discovered evidence.** *The court may grant a new trial* or other appropriate relief *on the ground of newly discovered evidence* which could not have been discovered by due diligence in time to move for a new trial pursuant to section (a) of this Rule:

> (1) *on motion filed within one year after the date the court imposed sentence* or the date it received a mandate

issued by the Court of Appeals or the Court of Special Appeals, whichever is later[.]

(Emphasis supplied).

*Love v. State,* 95 Md.App. at 428–29, 621 A.2d 910, commented both on subsection (c)'s longer period of grace for filing and on its narrower substantive base.

It is the third of the new trial provisions that is before us in this case. *This is a form of relief available over a far more extended period of time, one year rather than the ninety days available under subsection (b) or the ten days available under subsection (a).* There is, moreover, the possibility of two triggering events—the imposition of sentence or the receipt of an appellate mandate—for the running of the one-year clock, and a defendant is permitted to take advantage of the more favorable. *This form of relief, on the other hand, rests upon a far more narrow substantive base.*

(Emphasis supplied).

■■ Although the Motion for a New Trial based on newly discovered evidence was timely filed within one year of the verdicts, it nonetheless had a due diligence problem of a different nature. To justify the extended one-year filing deadline, it is required that the new evidence could not, with diligence, have been discovered within the first ten days after the verdict, so as to have permitted a more normal new trial motion pursuant to subsection (a). To wit, the extraordinarily extended filing period itself is not automatic but has to be justified by due diligence. *Love v. State,* 95 Md.App. at 430, 621 A.2d 910, noted in this regard.

To qualify as "newly discovered evidence" under the provisions of Rule 4–331(c), *it is not enough,* as the quotation states, *that the evidence have been "discovered since the trial," Jones,* 16 Md.App. at 477, 298 A.2d 483; *it is required, by the very terms of the Maryland Rule, that the evidence have been discovered more than ten days after a*

*verdict so that it was no longer timely "to move for a new trial pursuant to section (a) of this Rule."*

(Emphasis supplied).

Judge Long noted what was probably an actual lack of due diligence in failing to bring the evidence of alleged recantation within the more appropriate boundary of a Motion for a New Trial based on Rule 4–331(a).

> *I'm not sure* also that the defendant has met his burden of proof in showing *that there was due diligence given that the statements allegedly made by Jenna Jackson were made to a family member of the defendant one day after the verdict.* It may be that the defendant [and] his attorney didn't find out about that issue until later on, but clearly *if there was a recantation,* and I'm not persuaded there was, *it was made not eleven days after the verdict but one day after the verdict. So there is that issue of due diligence* that is floating out *there [was] not shown to the satisfaction of the court that there was due diligence on the part of the defendant.* But in any event I agreed to hear the motion.

(Emphasis supplied).

The test, of course, is whether the evidence was, in fact, discoverable and not whether the appellant or appellant's counsel was at fault for not discovering it. As we explained in *Love v. State,* 95 Md.App. at 436, 621 A.2d 910.

> *Even a good explanation for not having exercised due diligence is not the same thing as the actual exercise of that due diligence. It is the latter that is required, not the former.* The modifying clause "which could not have been discovered by due diligence ..." is an *in rem* characterization of the evidence itself, not an *in personam* comment upon the lawyerly performance.

(Emphasis supplied).

In the "interest of judicial economy," however, Judge Long elected to overlook his qualms about diligence and to entertain the motion on the ground of newly discovered evidence.

## Newly Discovered Evidence

The victim and key trial witness for the State had been the appellant's daughter, who was just short of her 12th birthday at the time of the trial. The allegation in the Motion for a New Trial was that she "recanted her testimony the day after the trial to another family member." The alleged "recantation" was made to her eleven-year-old cousin, Shakara Jackson, and occurred while she was visiting her cousin's school. The victim allegedly told her cousin that the victim's mother and stepfather "had made her say those things about her father at trial." The sum total of what the eleven-year-old abuse victim allegedly said to her eleven-year-old cousin on the day after the trial consisted of the following:

Q. What did Jenna tell you?

A. I asked her why she say those things that she said and *she said because [her] mom and stepfather forced me to say them.* And then I told her Uncle Gene was in jail. And *she said my mom and stepfather said he was going to be all right that they just won the case.* And *she said she misses him so much she would go home with him.*

(Emphasis supplied).

## An Informal Denial, Even If Made, Would Not Be a Recantation

At one point in his appellate brief, the appellant refers to what the abuse victim allegedly told her cousin as a "recantation." "The fact that she did not repeat her *recantation* in open court ... should not have been dispositive." (Emphasis supplied). That choice of words, of course, is potentially treacherous hyperbole. *Black's Law Dictionary* (7th ed.1999) defines the verb "recant":

To withdraw or renounce prior statements or testimony formally or publicly.

Just as a conversation between neighbors over the back fence is not "testimony," the confidential confession, "I lied," even if such a confession actually was made, is by no means a "recantation." The semantic problem, of course, is that once

the user gets into the habit of referring to such a confidence as a "recantation" two or three times, he has successfully scaled a linguistic plateau and the presumptuous usage becomes a deceptively familiar commonplace. At that point, the user can nonchalantly invoke caselaw dealing with actual recantations and it will seem, to the lazy ear at least, as if those recantation cases are apposite to the case at hand. The only place to stop such semantic slippage is before it gets started. We are not in this case dealing with anything that can fairly be termed a "recantation."

One might readily ask, "If a witness renounces her trial testimony, what difference does it make whether the renunciation takes place in the courtroom or on a school playground?" It makes a great deal of difference. If the renunciation occurs formally in a courtroom, there is no doubt about the fact that a renunciation actually took place. It only remains to determine 1) the truth of the renunciation; and 2) its legal significance, if true. That is why we use the term of art "recantation" to refer to that type of in-court renunciation. If the renunciation allegedly occurred on the school playground, by contrast, the biggest uncertainty of all may well be over the historic fact of whether such a renunciation even took place.

If we were faced with a real and undisputed recantation of her testimony by the key State witness, our evaluation of the legal significance of such a recantation would be far more problematic. In this case, however, the victim staunchly denied that she had ever made the statements attributed to her by her cousin. Under examination by appellant's counsel, the young abuse victim did not waver.

Q. All right. And during that conversation did you tell her that your mom and Patrick told you to say those things at trial?

A. *No, I didn't.*

Q. You didn't say that?

A. *No.*

Q. Did you tell her that you were afraid of your stepfather?

A. *No, I didn't.*

Q. Did you tell her that?

A. *No, I didn't.*

Q. Did you tell her that you would be promised to see your dad if you testified in court the day before?

A. I don't understand the question.

THE COURT: I'm not sure I do either.

Q. Did you tell Shakara that your parents promised you that you would be able to see your father if you testified in court against him; did you tell her that?

A. *No.*

Q. Did you say to Shakara that all those things didn't happen?

A. *No, I didn't.*

Q. You didn't tell her that?

A. *No.*

Q. Did you tell Shakara that you didn't know that your dad would go to jail if you testified against him?

A. *No, I didn't.*

(Emphasis supplied).

Under examination by the Assistant State's Attorney, the victim reaffirmed her trial testimony:

Q. *Jenna, everything that you testified to in this trial in court that day that your dad was on trial is that all true?*

A. *Yes.*

Q. You've not made any of it up?

A. *No, I haven't.*

(Emphasis supplied).

That, by no means, was a formal withdrawal or renouncement of her prior testimony. Far from being a recantation, it was a ringing reaffirmation. In denying the Motion for a New Trial, Judge Long so ruled:

*[T]he real issue before the court is whether there is persuasive and credible evidence of recantation on the part*

*of a crucial witness* in this case. And of course that witness is the victim, Jenna Jackson.

*Recant means according [to] Black's Law Dictionary "to withdraw or repudiate formerly and publicly."* Mindful of that definition, *the normal process employed when a witness recants is, one, the execution of a sworn affidavit, or, two, sworn testimony is elicited from the recanting witness at the hearing on the motion for new trial. We clearly have neither in this case.*

*Post trial recantations are looked upon with utmost suspicion.* The State's Attorney has already made note of that. One of the cases of many that says that is *Carr v. State,* 39 Md.App. 478, 387 A.2d 302.

In this case *there is no formal or public recantation.* To the contrary *the witness alleged to have recanted has come into this courtroom and testified under oath that she did not at any time recant her testimony.* Therefore the motion for new trial is denied.

(Emphasis supplied).

## The Threshold Question of Assessing Credibility

In the context of a Motion for a New Trial based on newly discovered evidence, there is a threshold question of the trustworthiness of the newly discovered evidence and of the credibility of its source. It is clear that the judge called upon to decide the motion may assess trustworthiness and credibility for himself, even though the verdict in the case was rendered by a jury.

In denying the Motion for a New Trial, Judge Long cited the case of *Carr v. State,* 39 Md.App. 478, 387 A.2d 302 (1978). Indeed, that case is instructive as to the broad discretion vested in the trial judge in assessing new trial motions. *Carr* is particularly instructive because it was a case involving an actual recantation of testimony. In *Carr* the defendant, upon his motion for a new trial, produced an affidavit signed by one of two key State's witnesses, in which the witness stated that his trial testimony had been false and had been given "under

the threat of persecution [sic] and arrest by the State's Attorney's Office." 39 Md.App. at 483, 387 A.2d 302. Notwithstanding the fact that it had been a jury trial, the trial judge assessed for himself the credibility of the recantation. "In the instant case the trial judge received and considered Oliver's affidavit but stated he did not consider it worthy of belief." *Id.* "[T]he trial judge did not believe Oliver's recantation." *Id.* at 483 n. 3, 387 A.2d 302.

In affirming the trial judge's decision to deny the new trial, this Court observed, *Id.* at 484, 387 A.2d 302:

> We note, as did the trial judge, that *post-trial recantations of witnesses are looked on with the utmost suspicion.* See, e.g., *United States v. Johnson,* 487 F.2d 1278 (4th Cir.1973). Under these circumstances we see no abuse of discretion.

(Emphasis supplied). We there quoted, 39 Md.App. at 483, 387 A.2d 302, *Jones v. State,* 16 Md.App. 472, 477, 298 A.2d 483, *cert. denied,* 268 Md. 750 (1973), as it articulated the standard for reviewing a decision by a trial judge on a motion for a new trial.

> "It is, of course, well established that *the granting or denial of a motion for a new trial lies within the sound discretion of the trial court* and *the action of the trial court* upon such a motion *will not be disturbed* on appeal *except under the most extraordinary and compelling reasons.*"

(Emphasis supplied). See *Couser v. State,* 36 Md.App. 485, 494–96, 374 A.2d 399 (1977), *aff'd,* 282 Md. 125, 383 A.2d 389 (1978). And see *Ruth v. State,* 133 Md.App. 358, 365–66, 757 A.2d 152 (2000); *Marks v. State,* 84 Md.App. 269, 290–91, 578 A.2d 828 (1990).

## "Merely Impeaching" Evidence Does Not Reach Critical Mass

█ In our case, by contrast with *Carr,* we are not dealing with a recantation of testimony by a witness, but with something significantly more peripheral. The witness took the stand at the hearing on the new trial motion and stood foursquare behind every syllable of her trial testimony. She

denied flatly ever having made the remarks attributed to her by Shakara Jackson. What then was the significance, in terms of threshold materiality, of the testimony of Shakara Jackson?

On at least three occasions this Court has stated that evidence that has value only for purposes of testimonial impeachment does not qualify as "newly discovered evidence" within the contemplation of the law governing motions for a new trial. In *Jones v. State*, 16 Md.App. at 477, 298 A.2d 483, we quoted with approval from *Johnson v. United States*, 32 F.2d 127, 130 (8th Cir.1929), for the proposition that to qualify as newly discovered evidence, the "evidence . . . must not be merely cumulative or impeaching." In *Bright v. State*, 68 Md.App. 41, 509 A.2d 1227 (1986), the "newly discovered evidence" that was advanced on a new trial motion was the transcript from a collateral hearing that would have been useful to the defense to impeach the testimony and the report of two key State's witnesses. The trial judge denied the new trial motion, and we affirmed that denial, stating at 68 Md. App. at 56, 509 A.2d 1227:

> *Since appellants* contend that they *would have used the* adjustment hearing *transcript for impeachment purposes,* . . . *the evidence did not qualify as "newly discovered."*

(Emphasis supplied). In *Love v. State*, 95 Md.App. at 431, 621 A.2d 910, we reaffirmed that same principle:

> No exception can be taken to the next two statements . . . that *the evidence* "must be material" and that it *"must not be merely* cumulative or *impeaching."*

(Emphasis supplied).

That same limitation on types of newly discovered evidence that do not qualify as a basis for awarding a new trial was stated for the Court of Appeals by Chief Judge Bell in *Argyrou v. State*, 349 Md. 587, 601, 709 A.2d 1194 (1998):

> *The evidence offered* as newly discovered *must be material to the result* and that inquiry is a threshold question. That

means that *it must be more than "merely cumulative or impeaching."*

(Emphasis supplied).

In *Campbell v. State,* 373 Md. 637, 670, 821 A.2d 1 (2003), Judge Harrell also made it clear that

[t]o be material *the evidence cannot be "merely* cumulative or *impeaching."* The Court of Special Appeals stated in *Love v. State,* that the difference between evidence that is "impeaching" and evidence that is "merely impeaching" is that the latter includes "collateral impeachment and peripheral contradiction."

(Emphasis supplied).

■ Unfortunately, those statements do not end the matter. Although three opinions of this Court and two from the Court of Appeals have now told us that newly discovered evidence that is "merely impeaching" will not compel or even justify the granting of a new trial, there remains the touchy problem of which impeaching evidence is "merely impeaching" and which is not. As both *Campbell v. State* and *Love v. State* have suggested, the answer to that riddle may lie in the notion of "collateral impeachment and peripheral contradiction."

In *Campbell v. State,* the newly discovered evidence was that a key State's witness in the murder case under review had on another occasion "falsely accused another person of murder in an unrelated case." 373 Md. at 644, 821 A.2d 1. In holding that the trial judge had not abused his discretion in denying the motion for a new trial, Judge Harrell pointed out that the new evidence "involved a collateral matter."

*Even if the evidence did impeach* Veal, *it would be collateral,* rather than material, *evidence* because it only shows that Veal lied about an unrelated matter not bearing directly on the evidence he presented at Campbell's trial.

373 Md. at 655, 821 A.2d 1 (emphasis supplied).

■■ The distinction between "impeaching" and "merely impeaching," albeit nuanced, is pivotally important. Newly discovered evidence that a State's witness had a number of

convictions for crimes involving truth and veracity or had lied on a number of occasions about other matters might have a bearing on that witness's testimonial credibility, but would not have a direct bearing on the merits of the trial under review. Such evidence would constitute collateral impeachment and would, therefore, be "merely impeaching." If the newly discovered evidence was that the State's witness had been mistaken, or even deliberately false, about inconsequential details that did to go to the core question of guilt or innocence, such evidence would offer peripheral contradiction and would, therefore, be "merely impeaching." If the newly discovered evidence, on the other hand, was that the State's witness had actually testified falsely on the core merits of the case under review, that evidence, albeit coincidentally impeaching, would be directly exculpatory evidence on the merits and could not, therefore, be dismissed as "merely impeaching."

In the case now before us, the testimony of Shakara Jackson, even accepting it *arguendo* at face value, was not that the eleven-year-old child abuse victim admitted testifying falsely, but only that she admitted testifying under strong pressure. Although that might be reason to question her credibility, it does not establish that she testified falsely. A daughter might be understandably reluctant to testify against her father, even if her testimony were true. With child custody at stake, moreover, the strong parental pressure could have been to testify truthfully, as surely as it could have been to testify falsely. The witness would have been a reluctant one in either event. The witness's alleged admission to Shakara Jackson went only to why the witness, reluctantly, testified. It did not go directly to the truth of her testimony. It bore on her testimonial credibility, but not directly on the substance of her testimony. Under the circumstances, it would seem to qualify only as collateral impeachment, to wit, as evidence that was "merely impeaching."

In terms of characterizing Shakara Jackson's testimony, putting it in a hypothetical context may help. If the victim's conversation with Shakara Jackson had, with appropriate changes of tense, taken place the day before her trial testimo-

ny rather than the day after and had been offered in rebuttal by the defense through Shakara Jackson, what would have been its evidentiary fate? Not qualifying under any exception to the rule against hearsay, it could not have been received as substantive evidence on the merits of the appellant's guilt or innocence. It could only have been received, if at all, as a prior inconsistent statement for the limited purpose of impeaching the victim's testimonial credibility. That makes its significance peripheral, to wit, "merely impeaching." Evidence that is merely impeaching does not reach critical mass, at least in terms of permitting an appellate court to hold that a trial judge abused his discretion in denying a new trial motion resting on such a predicate.

We will not, however, rest our holding on this borderline ground, but will go on and consider the case as if, *arguendo,* Shakara Jackson's testimony had been more that "merely impeaching."

### The Fluctuating Standard of Appellate Review For Rulings on New Trial Motions

In terms of the breadth of discretion entrusted to the trial judge in ruling on a motion for a new trial and the concomitant degree of deference that an appellate court will extend to such a ruling, there is a distinction, still in the process of being recognized and fully articulated, between new trial motions pursuant to Rule 4–331(a) and new trial motions pursuant to Rule 4–331(c).

New trial motions that must be filed within ten days, pursuant to subsection (a), almost invariably (if not invariably) are based on events that happen in the course of the trial; such as, e.g., rulings on admissibility, potential trial error that may or may not be recognized at the time of occurrence, jury instructions, jury behavior, etc. These events are of a type that will ordinarily happen under the direct eye of the trial judge. For that reason, subsection (a) expressly provides that the trial judge may order a new trial "in the interest of justice" for it is he who has his thumb on the pulse of the trial and is in a unique position to assess the significance of such

events. In *Buck v. Cam's Broadloom Rugs, Inc.*, 328 Md. 51, 57, 612 A.2d 1294 (1992), Judge McAuliffe stressed that the range of the trial judge's discretion is accordingly at its broadest when it involves "the judge's evaluation" of "the core question of whether justice has been done."

> [W]e are obliged to consider *the breadth of discretion that is afforded a trial judge in making this type of decision.* As we have seen in tracing the history of our treatment of this issue, the emphasis has consistently been upon *granting the broadest range of discretion to trial judges whenever the decision has necessarily depended upon the judge's evaluation of the character of the testimony and of the trial when the judge is considering the core question of whether justice has been done.*

(Emphasis supplied).

There is, however, a fundamental difference in kind between a new trial motion pursuant to subsection (a), dealing with what happens in the course of the trial and essentially under the eye of the trial judge, and a new trial motion pursuant to subsection (c), based on allegedly newly discovered evidence. The latter, by definition, deals with things outside the course of the trial, with evidence that was not introduced because it could not, with due diligence, have been discovered in time to be introduced. The litigation of a new trial motion pursuant to subsection (c) deals with phenomena, such as due diligence, that do not occur under the direct eye of the trial judge. In contrast to subsection (a), subsection (c) significantly does not contain the language "in the interest of justice" to be assessed by the trial judge.

Under either subsection of Rule 4–331, the abstract standard of appellate review is the abuse of discretion standard. That seems monolithic enough, but in actuality it is not. What may shift, depending on the ground for the new trial motion being reviewed, is the degree of deference extended to the trial judge's exercise of discretion. *Buck v. Cam's Rugs*, 328 Md. at 58–59, 612 A.2d 1294, expressly stated that the reins of appellate control over the trial judge's discretion may

be tighter or looser depending upon the ground advanced for the new trial motion.

> [I]t may be said that *the breadth of a trial judge's discretion to grant or deny a new trial is not fixed and immutable;* rather, it *will expand or contract depending upon the nature of the factors being considered, and the extent to which the exercise of that discretion depends upon the opportunity the trial judge had to feel the pulse of the trial* and to rely on his own impressions in determining questions of fairness and justice.

(Emphasis supplied).

The new trial motion that was granted in *Buck v. Cam's Rugs,* for instance, involved the trial judge's assessment that an improper closing argument by a civil defendant had resulted in a damage award that was far too low to be deemed "in the interest of justice." In affirming the trial judge, the Court of Appeals pointed out that on an issue of that sort, both the trial judge's discretion and appellate deference thereto are at their very broadest.

> We turn to the question of whether Judge Murphy abused his discretion in granting Buck a new trial. In so doing, we are obliged to consider *the breadth of discretion that is afforded a trial judge in making this type of decision.* As we have seen in tracing the history of our treatment of this issue, *the emphasis has consistently been upon granting the broadest range of discretion to trial judges whenever the decision has necessarily depended upon the judge's evaluation of the character of the testimony and of the trial when the judge is considering the core question of whether justice has been done.* We noted, for example, that "[w]e know of no case where this Court has ever disturbed the exercise of the lower court's discretion in denying a motion for a new trial because of the inadequacy or excessiveness of damages"

328 Md. at 57–58, 612 A.2d 1294 (emphasis supplied).

Judge McAuliffe went on, 328 Md. at 59, 612 A.2d 1294.

In the case before us, *the range of discretion of the trial judge was necessarily at its broadest. The motion for a new trial did not deal with* the admissibility or quality of *newly discovered evidence,* nor with technical matters. Instead, it asked the trial judge to draw upon his own view of the weight of the evidence; the effect of an accumulation of alleged errors or improprieties by defense counsel, no one of which may have been serious enough to provoke a request for, or justify the granting of, a mistrial; and the allegedly inadequate verdict, in determining whether justice would be served by granting a new trial.... *Because the exercise of discretion under these circumstances depends so heavily upon the unique opportunity the trial judge has to closely observe the entire trial, complete with nuances, inflections, and impressions never to be gained from a cold record, it is a discretion that will rarely, if ever, be disturbed on appeal. It is that concept which led this Court in the past to state,* albeit too broadly in the context of *all* motions for new trial, *that such a decision is effectively unreviewable.*

(Emphasis supplied).

The Court of Appeals opinion then contrasted the broad discretion vested in a trial judge on the type of issue before him in *Buck v. Cam's Rugs* with the significantly narrower range of discretion to deny motions based upon newly discovered evidence. There is, of course, virtually no discretion to refuse even to exercise discretion.

On the other hand, *a trial judge has virtually no "discretion" to refuse to consider newly discovered evidence* that bears directly on the question of whether a new trial should be granted. *See Wash., B. & A.R. Co. v. Kimmey, supra,* 141 Md. at 250, 118 A. 648 (*"discretion could not be characterized as sound which wholly disregarded evidence* by which its exercise should have been aided"). *See also Browne v. Browne,* 22 Md. 103, 112 (1864).

328 Md. at 58, 612 A.2d 1294 (emphasis supplied).

Even if, however, the trial judge, at the threshold, considers the newly discovered evidence, the appellate court will still

intervene whenever it is persuaded that the trial judge did not make a proper decision based on the newly discovered evidence.

> *[I]f newly discovered evidence clearly indicates that the jury has been misled, a new trial should be granted.* It would be plainly unjust to permit a verdict to stand, as against an application for a new trial seasonably made, if credible evidence, competent to be considered, and not previously discoverable by due diligence, supported the conclusion that the jury were misled as to the principal part of their award.
>
> *Wash., B. & A.R. Co. v. Kimmey, supra,* 141 Md. at 250, 118 A. 648. *See also Angell v. Just,* 22 Md.App. 43, 53, 321 A.2d 830 (1974) *(trial judge abused discretion in denying motion for new trial when newly discovered evidence was of sufficient significance to make it probable that a different result would be reached at a new trial ).*

*Id.* (emphasis supplied).

The Court of Appeals seemed to promise us comforting uniformity, 328 Md. at 57, 612 A.2d 1294, by beginning its analysis with a quotation from *Mack v. State,* 300 Md. 583, 600, 479 A.2d 1344 (1984), and the apparently reassuring cliche that the "question whether to grant a new trial" is entrusted to "the discretion of the trial court."

> *The question whether to grant a new trial is within the discretion of the trial court.* Ordinarily, a trial court's order denying a motion for a new trial will be reviewed on appeal if it is claimed that the trial court abused its discretion. *Kirsner v. State,* 296 Md. 567, 570–71, 463 A.2d 865, 867 (1983); *Colter v. State,* 219 Md. 190, 192, 148 A.2d 561, 561 (1959). However, *an appellate court does not generally disturb the exercise of a trial court's discretion in denying a motion for a new trial.*

(Emphasis supplied).

What emerges, however, is the vexing reality that there are in the field not one, but at least two significantly distinct, "abuse of discretion" standards. One is, indeed, virtually

unreviewable. Rarely, if ever, will a trial court, under it, be found to have abused its discretion. The other, by contrast, enjoys no such special immunity from appellate scrutiny. The trial judge still has discretion, of course, but significantly less discretion than in the first category of cases.

In the case now before us, Judge Long denied a motion for a new trial based on allegedly newly discovered evidence. Even under the less deferential standard applicable to the denial of a motion on such a ground, we are still persuaded that he did not overstep the less generous degree of discretion permitted him in such a case.

The motion for a new trial in *Argyrou v. State,* 349 Md. 587, 709 A.2d 1194 (1998), was also, as in this case, one based on newly discovered evidence. Chief Judge Bell reconfirmed the shifting contours of the abuse of discretion standard.

It may be said that *the breadth of a trial judge's discretion to grant or deny a new trial is not fixed and immutable,* it *will expand or contract depending upon the nature of the factors being considered, and the extent to which its exercise depends upon the opportunity the trial judge had to feel the pulse of the trial,* and to rely on his or her own impressions in determining questions of fairness and justice. Of course, the exercise of the discretion is reviewable for abuse.

349 Md. at 600, 709 A.2d 1194 (emphasis supplied).

As Judge Bell also made clear, however, the burden of proof remains firmly on the defendant and the motion for a new trial still has significant "prescribed requirements" that must be satisfied for it to succeed.

*Maryland Rule 4–331(c) provides for the grant of a new trial,* or other appropriate relief, *on the basis of newly discovered evidence, but only if the prescribed requirements are met.* To qualify as "newly discovered," *evidence must not have been discovered, or been discoverable by the exercise of due diligence,* within ten days after the jury has returned a verdict. In addition, the motion premised on newly discovered evidence must have been filed in the

circuit court, within the later of one year after the imposition of sentence or the issuance of a mandate by the appropriate appellate court. Maryland Rule 4–331(c)(2). Case law has delineated other essential requirements. *The evidence offered as newly discovered must be material to the result* and that inquiry is a threshold question. That means that *it must be more than "merely cumulative or impeaching."* In addition, *the trial court must determine that "[t]he newly discovered evidence may well have produced a different result, that is, there was a substantial or significant possibility that the verdict of the trier of fact would have been affected."*

349 Md. at 600–01, 709 A.2d 1194 (emphasis supplied).

### Discretion to Grant Is Discretion Not to Grant

As we turn to the merits of Judge Long's ruling, a further and self-evident observation is in order about the breadth of a trial judge's discretion. In *Butkiewicz v. State,* 127 Md.App. 412, 430, 732 A.2d 994 (1999), Judge Hollander made it very clear that necessarily inherent in the discretion to grant a new trial is the concomitant discretion to deny a new trial.

We do not mean to suggest that the trial court would necessarily have erred or abused its discretion had it ruled otherwise. *The court had discretion to grant appellant's motion for new trial, just as it had discretion to deny it.* Under the circumstances attendant here, the resolution of appellant's motion depended intrinsically upon "the judge's evaluation of the character of the testimony and of the trial," and its determination of "the core question of whether justice has been done...."

In conclusion, we cannot say that the court abused its discretion in denying appellant's motion for new trial.

(Emphasis supplied). See also *Mason v. Lynch,* 151 Md.App. 17, 27–30, 822 A.2d 1281 (2003); *Aron v. Brock,* 118 Md.App. 475, 511–12, 703 A.2d 208 (1997).

### The Appellant's Core Contention

Although the appraisal of newly discovered evidence is an arena in which, in the words of *Buck v. Cam's Rugs,* 328 Md.

at 57, 612 A.2d 1294, "the emphasis has consistently been upon granting the broadest range of discretion to trial judges" as they make an "evaluation of the character of the testimony" on the "core question of whether justice has been done," the appellant's theory of the case would severely cabin the judge's discretion.

The bare bones contention is presented without supporting argument. The appellant cites *Yorke v. State*, 315 Md. 578, 556 A.2d 230 (1989); *Campbell v. State*, 373 Md. 637, 821 A.2d 1 (2003); and *Evans v. State*, 382 Md. 248, 855 A.2d 291 (2004). Arguably, they are cited for the proposition that, once newly discovered evidence is in the case, the trial judge is largely stripped of discretion on the "core question of whether [absent that evidence at the trial] justice [was] done." One could distill from *Yorke, Campbell,* and *Evans* a largely mechanical, and far from discretionary, test that seems to assume for the newly discovered evidence maximum weight and credibility. It would deny the trial judge, who felt the pulse of the trial, the discretion to make the threshold or gatekeeping determination that the proffered evidence is either unworthy of belief or devoid of significance. We, however, get no such reading out of *Yorke, Campbell,* and *Evans,* which are silent as to the trial judge's role as a credibility gatekeeper.

### A Measuring Rod For Likely Impact

Quite obviously, the post-verdict discovery of new evidence should not result in vacating the original verdict and awarding a new trial unless the new evidence, offered before a new fact finder, would by some measure of likelihood produce a different verdict. The law obviously needs an articulable standard for measuring just what quality of newly discovered evidence might by some measure of likelihood produce a different verdict. The answer to such a question will inevitably remain a subject open to rampant speculation on a case by case basis, but the promulgation of a standard will at least help to reduce the level of uncertainty.

Until 1989, however, Maryland had not found it necessary to adopt such a standard. The two generally recognized national

poles were the "might" standard[1] and the "probable" standard.[2] *Yorke v. State,* 315 Md. at 586–88, 556 A.2d 230. Because the Court of Appeals concluded in *Stevenson v. State,* 299 Md. 297, 473 A.2d 450 (1984), that the newly discovered evidence in that case did not call for the granting of a new trial under either test, it did not choose to choose.

Under the circumstances present in this case, *we need not decide which standard should apply.*

299 Md. at 301, 473 A.2d 450 (emphasis supplied).

Five years later, however, it fell the lot of *Yorke v. State* to be the trailblazer. Writing for the Court of Appeals, Judge Orth posed the question, 315 Md. at 586, 556 A.2d 230, of what standard should be used to assess the likely impact on the verdict that the newly discovered evidence, had it been known, would have had.

The threshold question of materiality having been satisfied, the next inquiry is the degree of persuasiveness of the new evidence. In other words, *could the new evidence affect the outcome of the trial?* And *that inquiry can only be determined upon a standard by which the effect shall be tested.*

(Emphasis supplied).

Yorke had been convicted of first-degree rape. DNA evidence was just finding acceptance in the courts four years later when Yorke had a DNA test done which showed that he "could not have been the depositor of the semen" found in the vaginal washing of the victim. The negative DNA test was equivocal, however, because the victim 1) did not know whether the rapist had ejaculated in her and 2) had had sexual intercourse with her boyfriend several hours before the rape. *Yorke v. State,* 315 Md. at 589–90, 556 A.2d 230.

---

**1.** The "might" standard, the more lenient and defendant-friendly of the two tests, was generally referred to as "the *Larrison* test," from *Larrison v. United States,* 24 F.2d 82 (7th Cir.1928).

**2.** The "probable" standard, the more demanding and prosecutor-friendly of the two tests, was generally referred to as "the *Berry* test," from *Berry v. Georgia,* 10 Ga. 511, 526–27 (1851).

The question of the significance of the newly discovered DNA test was close enough, however, to require Maryland finally to take a stand on the governing standard for measuring likely impact. After surveying the caselaw from both the "might" camp and the "probable" camp,[3] Judge Orth concluded his survey with the wry comment:

> All in all, we are constrained to conclude that *the courts generally play by ear with an ad hoc approach* whether the newly discovered evidence calls for a new trial, *no matter what words they use* to describe the standard alleged to support the decision. It seems that they actually lean on the assertion, which has become a cliche, regarding hardcore pornography made by Justice Stewart, concurring in *Jacobellis v. Ohio:* "I know it when I see it."

315 Md. at 586–87, 556 A.2d 230 (emphasis supplied).[4] The *Yorke* opinion found little assistance in the national caselaw.

> Many of the federal courts incline toward the "probable" standard. As we have seen, *the state courts tend to flounder, and no uniform pattern emerges* from their decisions.

315 Md. at 588, 556 A.2d 230 (emphasis supplied).

Even while recognizing the arguable ineffectuality of any standard, Judge Orth nonetheless set out for Maryland what

---

3. Observing that both standards were "rather nebulous," Judge Orth summarized the two tests.

> Cases in other jurisdictions apply essentially the "might" standard or the "probable" standard. Both are rather nebulous. It seems that the most precise definition of the "might" standard appears in *United States v. Wallace,* 528 F.2d 863, 866 n. 3 (4th Cir.1976): "There is more than a faint possibility of a different jury verdict but something less than a probability."
> The "probable" standard, however, remains even more esoteric. It is generally referred to with no greater definement than was set out years ago in *Berry v. State,* 10 Ga. 511, 527 (1851), which spoke in terms of the evidence being "so material that it would probably produce a different verdict if a new trial were granted."

315 Md. at 586 (emphasis supplied).

4. Realistically, that may well remain the test both here and abroad, however much we pretend to the contrary.

has now for sixteen years been the standard for measuring the impact of newly discovered evidence.

We appreciate that it is impossible to formulate a litmus type test that would come up with a "yea" or "nay" as to whether the new evidence would change the verdict. *We favor,* however, *a standard that falls between "probable,"* which is less demanding than "beyond a reasonable doubt," *and "might"* which is less stringent than probable. We think that a workable standard is:

> *The newly discovered evidence may well have produced a different result,* that is, *there was a substantial or significant possibility that the verdict of the trier of fact would have been affected.*

315 Md. at 588, 556 A.2d 230 (emphasis supplied).

With the noun "possibility," Maryland tilts toward the "might" standard, but with the qualifying adjectives "substantial or significant," it tilts back a bit in the direction of the "probable" standard. Do the words really make any difference or will courts inevitably, as the *Yorke* opinion suggests, "play by ear with an *ad hoc* approach?" The likelihood that the newly discovered evidence would have affected the verdict need only be something less than probable, but should yet be something more than merely possible. Anything, after all, is possible. Qualifying the word "possibility" with the adjectives "substantial or significant" was *Yorke's* effort to convey some sense of how the trial judge should strike the balance.[5]

The bottom line in *Yorke v. State* was that the Court of Appeals affirmed the trial judge who had denied the motion for a new trial. The Court of Appeals relied heavily on the qualifying adjectives "substantial or significant."

We apply the standard we have adopted in determining whether the trial judge abused his discretion in denying

---

**5.** As this Court observed in *Love v. State,* 95 Md.App. 420, 431, 621 A.2d 910 (1993):

> In *Yorke v. State,* 315 Md. 578, 556 A.2d 230 (1989), however, the Court of Appeals opted to adopt an intermediate standard that fell somewhere between the *Berry* test and the *Larrison* test.

Yorke's motion for a new trial. We cannot say, in the light of our standard, that the new evidence touched on the evidence at the trial to the extent that it "may well have produced a different result." *We do not believe that there was "a substantial or significant possibility" that it would do so.*

315 Md. at 590, 556 A.2d 230 (emphasis supplied).

The newly discovered evidence in *Campbell v. State,* 373 Md. at 644, 821 A.2d 1, was that, in a murder case, a key State's witness had previously made a false accusation of murder against another person in an unrelated case. The *Campbell* court expressly adopted the test formulated by *Yorke v. State* for assessing the significance of newly discovered evidence. 373 Md. at 666–67, 821 A.2d 1. As *Campbell* summarized what *Yorke v. State* had done by way of the new test, it made it clear that the *Yorke* test differs significantly from the "might" standard.

We concluded that *although the new evidence "may well have produced a different result," there was not a "substantial or significant possibility" that it would do so.* We therefore held that the trial judge did not abuse his discretion in denying the motion for a new trial.

373 Md. at 668, 821 A.2d 1. The bottom line of *Campbell v. State* was that the Court of Appeals affirmed the decision of the trial judge to deny the motion for a new trial, finding that the mere possibility of producing a different result did not reach the loftier level of being a "substantial or significant possibility." Its holding was:

*Even if the additional evidence "may" produce a different result at a new trial, there is not a "substantial or significant possibility" that it would do so.*

373 Md. at 671–72, 821 A.2d 1 (emphasis supplied).

In *Evans v. State,* 382 Md. 248, 855 A.2d 291 (2004), the critical question, for capital sentencing purposes for two first-degree murders, had been whether Evans was the actual trigger man. The newly discovered evidence that was offered to cast doubt on his role as the trigger man was 1) descrip-

tions by witnesses of an African–American male in the hotel lobby shortly before the murders that differed from the actual appearance of Evans and 2) reports by other witnesses who had been in the hotel lobby within an hour before the murders occurred that they had seen no one in the lobby. The *Evans* opinion adopted verbatim the test for evidentiary significance from *Yorke v. State.*

> The substantive standard governing the grant of a motion for a new trial under Rule 4–331(c) is whether the newly discovered evidence is sufficiently "material and persuasive such that '[t]he newly discovered evidence may well have produced a different result, that is, there was *a substantial or significant possibility that the [decision] of the trier of fact would have been affected.*' "

382 Md. at 264, 855 A.2d 291 (emphasis supplied).

The bottom line of *Evans v. State* was that the Court of Appeals affirmed the decision of the trial judge to deny the motion for a new trial:

> We fully agree with the Circuit Court and the State that *the allegedly newly discovered evidence fails to create a substantial possibility* that a jury would find that Evans was not the "triggerman."

*Id.* (emphasis supplied). See also *Argyrou v. State,* 349 Md. 587, 601, 709 A.2d 1194 (1998); *Jackson v. State,* 358 Md. 612, 626, 751 A.2d 473 (2000); *Baker v. State,* 367 Md. 648, 694–98, 790 A.2d 629 (2002); *Miller v. State,* 380 Md. 1, 28, 843 A.2d 803 (2004); *Love v. State,* 95 Md.App. 420, 431–32, 621 A.2d 910 (1993).

### Assessing Weight and Credibility Is an Indispensable Part of Exercising Discretion

In the last analysis, the *Yorke* test is a guideline for the trial judge as he undertakes his assessment of the significance of newly discovered evidence. The *Yorke–Campbell–Evans* line of cases does not touch the subject of the continuing obligation of the trial judge, as a part of his exercise of discretion, to make a threshold determination as to the credibility of alleg-

edly newly discovered evidence. Those three cases had no need to deal with, and did not deal with, the trial judge's role in assessing the credibility of the evidence. In *Yorke*, the DNA test evidence was what it was; it was not in dispute. In *Campbell*, the record of the witness's earlier false accusation in another case was not in dispute. In *Evans*, the FBI interviews and reports were not in dispute.

By no means did the *Yorke*, *Campbell*, and *Evans* cases even suggest that an appellate court should assume significant credibility and weight for newly discovered evidence and then apply the *Yorke* test for itself. Both evaluating the credibility of the evidence, in the first place, and then weighing the significance of the evidence, in the second place, remain within the broad discretion of the trial judge. The *Yorke* Court, 315 Md. at 590, 556 A.2d 230, recognizing that the weighing process was properly in the hands of the trial judge, stated:

> The short of it is that *the judge found that the newly discovered evidence, weighed with the evidence before the jury* at the trial on the merits, *did not affect the verdict* to the extent that the outcome of the trial would be different.

(Emphasis supplied).

> *Yorke v. State, id.*, clearly conducted its review under an abuse of discretion standard and not under an error standard.

> We have now filled in the blank in our cases regarding the standard to be used in assessing the impact of newly discovered evidence on a verdict of guilty. *We apply the standard we have adopted in determining whether the trial judge abused his discretion in denying Yorke's motion for a new trial.* . . . We hold that *the trial judge did not abuse his discretion* in denying the motion for a new trial.

(Emphasis supplied).

In *Campbell v. State*, 373 Md. at 672, 821 A.2d 1, Judge Harrell made it clear that in the assessment of newly discovered evidence, it is the "sense" of the trial judge, rather than an abstract measuring rod, that will be entrusted with determining the significance of the evidence.

*The trial judge "felt the pulse of the trial" and was entitled* to rely on his own impressions *to determine,* without exceeding the limits of his discretion, *that the new evidence bearing on Oscar Veal's trustworthiness was not substantially likely to tip the balance in favor of Campbell.*

(Emphasis supplied).

*Campbell* recognized that newly discovered evidence does not enjoy presumptive credibility and that it is within the prerogative of the trial judge to find whether it is "persuasive."

*In order for the newly discovered evidence to warrant a new trial, the trial judge must find it to be* both material and *persuasive* such that "[t]he newly discovered evidence may well have produced a different result, that is, there was a substantial or significant possibility that the verdict of the trier of fact would have been affected."

373 Md. at 666–67, 821 A.2d 1 (emphasis supplied). The ultimate review, moreover, was clearly under the abuse of discretion standard.

Even if the new evidence as to Veal was material and Petitioner was found to have exercised due diligence, *the trial judge did not act in an arbitrary or capricious manner by denying the motion for a new trial.*

373 Md. at 671, 821 A.2d 1 (emphasis supplied).

■ Because so much depends on the inherent "sense" of justice of the trial judge, the only judicial figure who had his thumb on the actual pulse of the trial, the judge's exercise of discretion in evaluating credibility is indispensable. It is not for an appellate court to decide whether it thinks a piece of newly discovered evidence might have made a difference. *Buck v. Cam's Rugs,* 328 Md. at 59, 612 A.2d 1294, explained why appellate deference to the trial judge's discretion is so compellingly appropriate.

Because the exercise of discretion depends so heavily upon *the unique opportunity the trial judge has to closely observe the entire trial, complete with nuances, inflections, and impressions never to be gained from a cold record, it is a discretion that will rarely, if ever, be disturbed on appeal.*

It is that concept which led this Court in the past to state, albeit too broadly in the context of *all* motions for new trial, that such a decision is effectively unreviewable.

(Emphasis supplied).

It is the trial judge whose instinctive sense of justice is being appealed to, and it is the trial judge who is uniquely competent to assess whether the newly discovered evidence is even worthy of being credited. In *Jones v. State*, 16 Md.App. at 477, 298 A.2d 483, we pointed out in this regard:

> *It is essentially the function of the trial judge to evaluate and assess the newly discovered evidence* and *where such evidence consists of testimonial evidence* from a witness allegedly discovered after the trial has been concluded, *it is for the trial judge to determine* the materiality and *the credibility of such testimony.*

(Emphasis supplied).

*Jones v. State* also quoted, with approval and at length, 16 Md.App. at 478, 298 A.2d 483, from *Jones v. United States*, 279 F.2d 433, 436 (4th Cir.1960):

> The motion for new trial on the basis of newly discovered evidence "is designed to serve the ends of justice.... *That purpose would hardly be served if the law required the trial judge, who heard all of the evidence and saw all of the witnesses, to assume that a jury would believe testimonial evidence however improbable and unworthy of belief he finds it to be.* If the purpose of the remedy is to be served, without subjecting it to undue abuse, *the trial judge* who approaches the question of the probable effect of the new evidence upon the result, in the event of a new trial, *should be vested with a broad discretion in considering matters of credibility as well as of materiality.* Stringent or artificial limitations upon the exercise of the discretionary power of the trial judge to grant new trials could only subvert the purpose of the remedy."

(Emphasis supplied).

In our *Jones v. State*, 16 Md.App. at 479, 298 A.2d 483, we affirmed the decision of the trial judge not to grant a new trial based on testimony that he found to be "unworthy of belief."

[I]t is equally apparent that *Judge Taylor simply found Chase's testimony to be unworthy of belief.* As he put it, "I would have to close my eyes to the logical inferences that are to be drawn from his testimony and from what I heard at the trial of this case on the merits in order to grant this motion for a new trial * * *." It is entirely clear that *the trial judge found Chase's testimony* relating to the shooting of Michael Holland *to be inherently untrustworthy and not worthy of submission to a jury or a judge on retrial.* In his role as fact-finder, *this was Judge Taylor's prerogative.*

(Emphasis supplied).

In *Argyrou v. State,* 349 Md. 587, 709 A.2d 1194 (1998), the allegedly newly discovered evidence was a confession by a third person that he, rather than the convicted defendant, had actually committed the crime. If assumed to be true, that would certainly have been significant. The trial judge denied the motion for a new trial, however, and both the Court of Special Appeals and the Court of Appeals affirmed the denial. At the outset of his opinion, Chief Judge Bell observed with respect to a trial judge's assessment of credibility:

*A trial court has wide latitude in considering a motion for new trial and may consider a number of factors, including credibility,* in deciding it; thus, *the court has the authority to weigh the evidence and to consider the credibility of witnesses* in deciding a motion for a new trial.

349 Md. at 599, 709 A.2d 1194 (emphasis supplied).

Judge Bell made it clear that the assessment of credibility is an important factor when the basis advanced for the new trial is that of newly discovered evidence.

*The trial courts also have authority* to weigh the evidence and *to consider credibility of witnesses when the motion is grounded on newly discovered evidence.* ("*Where there is a grave question of the credibility of after-discovered evidence . . . the role of the trial judge is that of the fact-finder.*").

349 Md. at 600, 709 A.2d 1194 (emphasis supplied).

Although the narrow finding of the trial judge in *Argyrou* had been that the evidence proffered was not, in fact, newly

discovered, the trial judge's suspicion that the third party confession was a sham was a key factor in the ultimate equation.

> *[I]t clearly seems to be that the court distrusted the circumstances surrounding the confession; it found the timing of it untrustworthy and suspicious.* While the confession may have largely been true, the court was not satisfied that, viewed from the perspective of Rule 4–331(c), it was timely. In short, the court focused not on the credibility of the confession in all of its details; *it was,* instead, *focused on the trustworthiness of the totality of the circumstances giving rise to the confession. In so doing, the court did not abuse its discretion.*
>
> To be sure, the *credibility determinations of the trial court in this case are important.* It is obvious that, in reaching its threshold determination, *the court believed the witnesses for the state.* Indeed, *it was that testimony which,* it must be inferred, *caused the court to distrust the timing and circumstances of the confession.*

349 Md. at 606–07, 709 A.2d 1194 (emphasis supplied).

Judge Bell's review of the caselaw revealed that the trial judge's assessment of the credibility and trustworthiness of the evidence is a vital factor in the final exercise of the trial judge's discretion.

> *The cases* that have addressed this issue *have focused* not simply on the credibility of the person offering the exculpatory evidence, but *on the credibility or trustworthiness of the evidence itself, as well as the motive, or other impeaching characteristics, of those offering it.* ... In *United States v. Oliver,* 683 F.2d 224 (7th Cir.1982), a letter exculpating the defendant was offered in support of the defendant's motion for new trial. *In denying the motion, the court noted "[s]erious questions concerning trustworthiness and motive" surrounding the letter,* that the letter was not sent until after trial, and that the author was the defen-

dant's friend and a felon, concluding that *an "aura of suspicion and doubt engulfed" the evidence.*

349 Md. at 608, 709 A.2d 1194 (emphasis supplied).

In *Jackson v. State,* 358 Md. 612, 751 A.2d 473 (2000), the focus was on the procedural question of whether, on a motion for a new trial, a hearing was required. In that case it was. Judge Wilner's very thorough analysis made it clear that at such a hearing, although it would be helpful to the judge to hear argument about the credibility of evidence, in the last analysis it would be up to the judge whether to give the evidence any credibility or not.

The second prong [that the newly discovered evidence "may well have produced a different result"] is a judgmental one—weighing the effect of the evidence ... *Williams's later statement* that he inserted the gag, *if credited, could possibly have led the judge to reconsider* petitioner's contention. *Obviously, the judge was not required to credit that statement,* but whether he should credit it, and, if he did, whether that evidence "may well have produced a different result" were matters upon which oral argument may have been helpful to petitioner.

358 Md. at 626–27, 751 A.2d 473 (emphasis supplied).

In *Baker v. State,* 367 Md. 648, 698, 790 A.2d 629 (2002), Judge Cathell wrote for the Court of Appeals in affirming the decision of the trial judge to deny a motion for a new trial. It was clear that the weighing of the significance of the newly discovered evidence was entrusted to the broad discretion of the trial judge.

*The trial court then weighed the effect of the evidence* and determined that the evidence would not have produced a different result in the sentencing. *That determination was well within the court's proper exercise of discretion.* We affirm the judgment of the trial court.

(Emphasis supplied).

In *Miller v. State,* 380 Md. 1, 843 A.2d 803 (2004), the newly discovered evidence suggested, but did not conclusively prove, that a key State's witness had actually testified pursuant to a

"deal" for leniency but had, on the stand, falsely denied any such deal. The trial judge did not find "one ambiguous response" giving rise to such a possibility weighty enough to justify awarding a new trial. Judge Wilner summarized the judge's ruling.

Having heard all this evidence, *the trial judge found, as a fact, that, even if that one ambiguous response could be regarded as newly discovered evidence,* "the Defendant has not met his burden to demonstrate that there is a substantial or significant possibility that the verdict of the jury in either the guilt/innocence or the sentencing phases of this case would have been affected." The court obviously did not believe that, had the jury heard that one response, in context and along with all of the other evidence bearing on the question, its verdicts and sentence would have been any different.

380 Md. at 27, 843 A.2d 803 (emphasis supplied).

A fragmented four-to-three Court of Appeals affirmed the ruling of the trial judge under the abuse of discretion standard.

Newly discovered evidence warrants a new trial only if it "may well have produced a different result, that is, there was a substantial or significant possibility that the verdict of the trier of fact would have been affected" and that *the only issue on appeal from a ruling denying such a motion is whether the trial court abused its discretion* in concluding that that test had not been met. *There is nothing in this record to justify upsetting the trial judge's conclusion* that Miller had failed to establish that possibility.

380 Md. at 28, 843 A.2d 803 (emphasis supplied).

### A Proper Discretionary Ruling Was Made

 Whether in terms of credibility or in terms of significance or both, Judge Long gave short shrift to the testimony of Shakara Jackson. He seemed to resolve the credibility dispute between Shakara Jackson and the victim in favor of the victim, as he observed:

In this case there is no formal or public recantation. To the contrary, *the witness alleged to have recanted has come into this courtroom and testified under oath that she did not at any time recant her testimony.*

(Emphasis supplied).

Judge Long had prefaced that finding of fact by posing "the real issue" that was before him for determination.

[T]he real issue before the court is *whether there is persuasive and credible evidence of recantation on the part of a crucial witness* in this case. And of course that witness is the victim.

(Emphasis supplied). The only fact in dispute was the very happening of the schoolhouse conversation. That, therefore, was the only thing as to which Judge Long could have been seeking "persuasive and credible evidence." Self-evidently, there had been no formal and public recantation by the witness in the courtroom. That negative event spoke for itself and required no further resolution.

Although Judge Long's discussion leading to the ruling, to be sure, wandered back and forth between a formal courtroom recantation and an informal schoolhouse "recantation," the observation that the witness who had allegedly recanted "has come into this courtroom and testified under oath that she did not at any time recant her testimony" obviously makes reference to the informal schoolhouse "recantation." The reference to the fact that the witness was "alleged to have recanted" also obviously relates to what happened at the schoolhouse. There was no allegation that the witness recanted in the courtroom. Judge Long's overall discussion unquestionably was not confined to the fact that there was no formal recantation in the courtroom.

We read Judge Long's conclusion to be that Shakara Jackson's version of the disputed conversation lacked credibility, whereas the victim's version was credible. A closely intertwined and essentially indistinguishable possibility, of course, is that Shakara Jackson's testimony, even if true, was found to be not weighty enough to "persuade" the judge to grant relief.

In the alleged conversation, the victim never actually said that her testimony had been false. The bottom line was that the evidence presented by the appellant did not persuade Judge Long that a new trial should be awarded. We cannot be absolutely certain of this as his thought process but, being appropriately deferential, we find it to be highly plausible. A discretionary ruling does not require a formal opinion.

Whether in terms of evaluating Shakara Jackson's credibility or weighing the significance of her testimony or an undifferentiated amalgam of both, Judge Long exercised the discretion entrusted to him in ruling on a motion for a new trial.

### A Possible Alternative Contention

There is a possibility that the appellant is raising a slightly different contention. He may be making the argument that, even if the judge's discretionary decision fell within the broad range permitted it by the *Yorke* test, the trial judge's decision would still have to be reversed, as a matter of law, if the judge said the wrong words in making his decision. In his brief, the appellant does argue:

> The trial court applied the incorrect standard in denying the motion for new trial.... Under these circumstances, *the trial court's failure to apply the correct standard in ruling on the motion* for new trial *requires reversal* of the court's ruling denying the motion.

(Emphasis supplied).

We are, to be sure, framing more of an argument for the appellant than he made for himself, but he may be contending that Judge Long erroneously relied exclusively on the absence of a formal courtroom recantation and failed to recognize that even an informal renunciation of critical testimony as false might theoretically satisfy the *Yorke* test for granting a new trial. The argument may be, not that Judge Long could not have rejected the evidence from Shakara Jackson as lacking sufficient credibility or sufficient weight, but only that he failed to do so, relying instead exclusively on the absence of a formal recantation.

We hold this argument, if it is being made, to be flawed in two respects. In the first place, as we have just discussed at length, we do not believe that Judge Long's reasoning was so tightly confined. Although he defined the term "recantation" in formal terms and made regular references to a formal recantation, his observations and his implicit findings of fact went beyond that.

In the second place, if the language of the ruling seems unduly concerned with the subject of recantation, the reason is readily understandable. The new trial motion alleged that the child abuse victim had "recanted her testimony the day after the trial." At the conclusion of the hearing, moreover, Judge Long asked for argument and appellant's counsel responded:

> There is now testimony, depending on who you believe, that [the victim] recanted her testimony.

Other than a passing allusion to the possibility that the child witness had been "coached," something that would, at best, qualify for the "merely impeaching" category, that was the only argument for a new trial even skeletally advanced. Judge Long was answering the only argument that was presented to him.

In response to the only thing being urged on the court by the appellant, Judge Long's ruling may well have been saying, in effect, "You are asking for a new trial on the basis of an alleged recantation. This is what the term 'recantation' means, and what you are offering is not a recantation." Neither the grounds raised in the Motion for a New Trial nor the argument made at the hearing on the motion ever got beyond that. The very subject of a broader rationale for granting a new trial motion was never raised by the appellant.

### A Modest Conclusion

In terms of the deference that an appellate court should extend to a discretionary ruling by a trial judge, we find inspiring the instance of appellate discipline exercised by this Court in *Thodos v. Bland,* 75 Md.App. 700, 542 A.2d 1307 (1988). The trial judge denied a Motion for a New Trial under

circumstances in which this Court, had the decision been its to make, would have granted the motion. That predisposition on our part, however, should not have been and was not controlling. It is meaningless to pay lip service to deference when you agree with what the trial court did. The acid test of deference is when you disagree. As so well expressed by Judge Bell (now Chief Judge of the Court of Appeals), 75 Md.App. at 717, 542 A.2d 1307:

> *Were we ruling upon appellant's new trial motion, we would have unhesitatingly granted it.* Nevertheless, *we are unable to rationalize* a basis for *finding that the trial judge abused his discretion.* Accordingly and *regretfully, we affirm* the judgment.

(Emphasis supplied). When a court can say, "Regretfully, we affirm," the court is exercising robust appellate discipline.

We are not suggesting in this case that our decision, had we been called upon to make one, would necessarily have been different from that made by Judge Long. We are simply holding that, even if that had been the case, we would still extend to his decision the deference that is its due.

### Two Questions From the Jury

In the course of the jury deliberations, Judge Long summoned counsel to the bench and informed them of an inquiry from the jury:

> Counsel, I have shown you the note we have received from the jury. They wanted [the] date father's custody petition [was] filed. The date father's custody petition was served on the mother. The date the father's custody petition was withdrawn.

The information the jury sought was not, however, in evidence, as Judge Long made clear to counsel.

> My recollection of the evidence in this case, the testimony in this case would suggest that none of those dates came in and I'm inclined to tell that we cannot give them that information [because it is] not in evidence. And they can

only decide the case based on the evidence that they have heard.

[DEFENSE COUNSEL:] Can we tell [them] that the petition was filed after 2000, because that's clear.

THE COURT: Ms. Hickman.

[THE PROSECUTOR:] Your Honor, I don't think there was testimony that—

THE COURT: I think that information was made clear in the testimony, but they didn't specifically ask for that and I'm inclined not to inquire [into] that.

Judge Long brought the jury back into the courtroom and gave the following response.

THE COURT: Mr. Foreman, I have a note from you [that] you want the dates that the father's custody petition was filed, the date the father's custody petition was served on the mother, and the date the father's custody petition was withdrawn.

[THE FOREMAN:] Yes, sir.

THE COURT: We cannot give that to you for one or two reasons or maybe both. One is because we don't have it. And even if we did, the recollection of all of us would suggest that it is not in evidence and, therefore, you remember what I said to you earlier you could only decide the case based upon the evidence and testimony that was either introduced as physical evidence or the testimony that came from the witness stand and the reasonable inferences that you could draw from that. So I can't help you. I'm sorry.

You can retire and continue your deliberations.

At the threshold, we note that the appellant did not object to Judge Long's handling of the situation. Quite aside from that, however, Judge Long was eminently correct in his response to the jury. Those dates requested by the jury were not in evidence. Without anguishing any further over this subcontention, we see no error.

█ Approximately one hour later, the jury submitted a second question. Judge Long informed counsel of the content

of the inquiry and of his proposed response to it. Counsel for the appellant registered a half-hearted objection.

THE COURT: Counsel, we have another note from the jury. We would like to hear the testimony of Terri Taylor again. I've asked the court reporter. She did not record these proceedings. Even if I were to allow it to happen, she didn't record the proceedings. And we're not set up with real-time capabilities. *It would take a considerable amount of time for us to have it transcribed and read to them.* So I think what we usually do is what I'm going to do in this case and that is to suggest that they have to rely on their recollection of the testimony.

[DEFENSE COUNSEL:] Can I be heard just off the record?

THE COURT: Sure.

[DEFENSE COUNSEL:] *It's my understanding it would take about an hour to transcribe that. I'm only trying to make a record,* Judge. I mean *I would object, I guess, for the record* and ask, [since] it was only a ten minute testimony anyway that they asked for, that they be given it.

(Emphasis supplied). Although that objection was less than Churchillian, it was enough.

Terri Taylor had been the appellant's attorney in the custody proceeding. She had been retained on January 18, 2000, and subsequently filed the custody, the visitation, and the contempt requests on his behalf. When, following the bench conference, the jury returned to the courtroom, Judge Long responded to its inquiry.

Mr. Foreman, I have a note. It says we would like to hear the testimony of Terri Taylor again.

Unfortunately, again I'm not going to be much help to you. We don't have the capabilities to do that. Although my court reporter does transcribe the proceedings—I'm sorry, does record the proceedings, she would have to transcribe the proceedings and we'd have to read them back to you.

Real-time, if we had real-time capabilities it would almost simultaneously bring up the testimony. We have coincidentally this Tuesday met with the county commissioners to upgrade the court reporter's software package, but we don't have the capabilities to do that. So what we're going to ask you to do is to rely on your notes and your recollection of the testimony of Ms. Taylor. All I can say is, she wasn't the last witness. She was one of the last witnesses to testify.

Although the appellant now claims that both responses constituted abuses of discretion, he clearly puts his emphasis on the second response. Maryland Rule 4–326(c) deals with a "Jury request to review evidence." Its language is quintessentially the language of discretion.

The court, after notice to the parties, *may* make available to the jury testimony or other evidence requested by it.

(Emphasis supplied).

The appellant cites *Veney v. State*, 251 Md. 159, 246 A.2d 608 (1968), for the proposition that Judge Long had "the discretion to have the court reporter read back [the] requested trial testimony to the jury." Of course, he did. If the posture of the case were reversed and if it were the State somehow appealing his decision to do so, we would affirm such an exercise of discretion. Inherent within the discretion to do something, however, is the self-evident discretion not to do something. That is what the very concept of discretion means. As the *Veney* opinion itself phrased the largely unfettered range of judicial discretion, 251 Md. at 173, 246 A.2d 608:

*The trial judge within his discretion may permit* the reading to the jury of the official court stenographer's notes of the testimony at the trial, *or may refuse permission so to do.*

(Emphasis supplied).

Appellate courts are highly deferential to a trial judge's discretionary determinations. Even in cases in which the appellate court might have deemed it wiser or fairer to have ruled otherwise, it will not presume to substitute its judgment

for that of the trial court except in the rare case in which the trial judge has literally abused his discretion. To rule differently than the appellate court might have ruled is not, *ipso facto,* such abuse. In *Hart v. Miller,* 65 Md.App. 620, 501 A.2d 872 (1985), another case cited by the appellant, Judge Getty well observed for this Court, 65 Md.App. at 626–27, 501 A.2d 872:

Discretion signifies choice. Consideration of the problem does not preordain a single permissible conclusion.

See also *Leach v. State,* 47 Md.App. 611, 625, 425 A.2d 234 (1981) ("[I]t is in the sole discretion of the trial judge to have portions of the transcript read to the jury when requested under Maryland Rule [4–326(c) ].").

Much of the caselaw cited by the appellant deals with situations in which a trial judge fails utterly to exercise discretion at all, a situation quite distinct from actually exercising discretion but doing so in a way adverse to the wishes and the interests of the protesting party. In this case, Judge Long, for better or for worse, clearly exercised his discretion as he explained to counsel that granting the request would consume too much time.

It would take a considerable amount of time for us to have it transcribed and read to them.

Even in objecting, appellant's counsel estimated that "it would take about an hour to transcribe that." At that point, it was shortly after 7 P.M. Our point, for the moment, is that we are dealing with an actual exercise of discretion, and not with a non-exercise. In exercising his discretion, Judge Long also noted in his response to the jury that, in this single day trial, Terri Taylor had been "one of the last witnesses to testify" before the jury began its deliberations at 4:46 P.M. The trial transcript reveals that at least six witnesses had testified before Terri Taylor took the stand and that only a single witness followed her to the stand. Judge Long's point was that the jury's recollection of Terri Taylor's testimony should still have been fresh.

*Yuen v. State,* 43 Md.App. 109, 403 A.2d 819 (1979), was a case in which, after acknowledging that the trial judge had the discretion to permit counsel in closing argument to read from portions of the trial transcript, this Court held that it was not an abuse of discretion for him to have refused to permit such a reading.

The deference that an appellate court will extend to a discretionary decision by a trial judge was eloquently expressed by Chief Judge Wilner for this Court in *North v. North,* 102 Md.App. 1, 14, 648 A.2d 1025 (1994):

> There is a certain commonality in all of these definitions, to the extent that they express the notion that *a ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling.* The decision under consideration has to be *well removed from any center mark imagined* by the reviewing court and *beyond the fringe of what that court deems minimally acceptable.*

(Emphasis supplied).

Judge (now Chief Judge) Bell wrote to the same effect for the Court of Appeals in *In re Adoption/Guardianship No. 3598,* 347 Md. 295, 312, 701 A.2d 110 (1997):

> *Questions within the discretion of the trial court are "much better decided by the trial judges than by appellate courts,* and the decisions of such judges should only be disturbed where it is apparent that some serious error or abuse of discretion or autocratic action has occurred."

(Emphasis supplied).

We hold that in his responses to the two jury inquiries in this case, Judge Long was not guilty of an abuse of judicial discretion.

### Considerations at Sentencing

▇ The appellant's trial concluded on March 11, 2004. Judge Long pronounced sentence on the appellant on June 10. In complete compliance with Maryland Rule 4–341, Judge Long had ordered a Presentence Report. Copies of that

report were timely sent to both the appellant and the State. At the outset of the sentencing hearing, Judge Long asked counsel if they had "any additions or corrections to the presentence investigation." Counsel for the appellant responded, "I have two."

One of the areas routinely investigated in the course of preparing a Presentence Report is that of employment. Although the appellant himself had made no mention of it to the investigator, it was learned that from early 2000 until the spring of 2002, the appellant had been employed as an associate minister with the Liberty Rock Church in Crisfield. The investigator checked with the minister of that church and learned the following, as he summarized it in his Presentence Investigation report.

> Although not mentioned by Mr. Jackson, it was learned that Mr. Jackson was also involved as an associate minister with Liberty Rock Church in Crisfield from early 2000 to spring 2002. On 4/28/04 Mr. Dave Dunn, who was the pastor of the church for thirteen years prior to his recent resignation, met with the undersigned to provide information about Mr. Jackson. Mr. Dunn advised that he and his congregation were duped and scammed by Mr. Jackson who used his position of trust as a method of influence and power for his financial gain. Mr. Dunn noted that Mr. Jackson talks eloquently and gives off an aura of genuineness causing people to follow his lead. Mr. Dunn noted he and other church members have lost thousands of dollars based on their blind trust of Mr. Jackson. Mr. Dunn acknowledged strong feelings of betrayal by Mr. Jackson which caused Mr. Dunn to doubt his ability to pastor resulting in his resignation. In summary, Mr. Dunn stated that Mr. Jackson never sees himself as wrong and opts to trade performance for integrity.

The appellant took understandable umbrage at that section of the Presentence Report. Although he used the word "object," what he actually did was to argue that Judge Long should discredit the former employer's characterization of the

appellant because it was uncorroborated and that he should give it little, if any, weight.

Well, Judge, I would object, I guess, to the statement that David Dunn himself made to the Presentence Investigator about the fact that he was duped and scammed by Mr. Jackson. I don't think that there is any evidence to suggest that. *Perhaps he had a bad relationship with him* or whatever, but certainly *there is nothing* in the Presentence Investigation *that indicates he was duped or scammed* other than he talks about some things that *there just seems to be nothing to corroborate what this man is saying.* I don't know what his letter says, but I would ask that the Court negate that.

(Emphasis supplied).

That is the sum total of objection made by the appellant to the sentencing proceeding. The appellant did not offer any counter evidence. The appellant did not ask for additional time to produce any counter evidence. We see no error with respect to Judge Long's consideration of the Presentence Report.

The second prong of the contention is a tempest in a teapot. It seems to be the local custom in Somerset County for various parties interested in the sentencing to write to the judge directly or to submit letters through counsel, offering their appraisal, good or bad, of the defendant about to be sentenced. When such letters are addressed directly to the court, Judge Long indicated that it was his regular practice to send copies of such letters both to the State and to the defense.

Reverend David Dunn, the minister of the Liberty Rock Church and the appellant's former employer, in addition to talking to the presentence investigator, sent a letter to Judge Long directly. This was revealed to the appellant at the outset of the sentencing proceeding.

THE COURT: I also received three letters and I want to know—

[DEFENSE COUNSEL:] *Yes, and I have several more for the Court.*

THE COURT: Do you have all three of those letters?

 * * * * * *

THE COURT: And then I have a letter from David Dunn.

[DEFENSE COUNSEL:] David Dunn.

[DEFENSE COUNSEL:] Well, I wouldn't have gotten that letter.

[THE PROSECUTOR:] I have all three of those letters, yes, uh.

[DEFENSE COUNSEL]: *I do not have David Dunn's letter.*

THE COURT: *All right. I'll get that for you. I think that one just came in* so it may be why—*we try to send these out when we get them.*

[DEFENSE COUNSEL]: I understand, Your Honor.

(Emphasis supplied).

We note several things of significance. In terms of timeliness for all such letters to be received, appellant's counsel indicated that he had three additional letters to submit at the sentencing hearing itself. The record also contains 24 letters written on the appellant's behalf, many of them having been mailed to Judge Long directly.

On appeal, albeit not at the sentencing hearing itself, the appellant now takes the State to task for not having "provide[d] to the defense in advance of sentencing any information that the State expect[ed] to present to the court for consideration in sentencing, and that was not done."

The State did not submit the letter. It was sent directly to Judge Long. The letter was dated June 8. The sentencing hearing was on June 10. Judge Long indicated that "that one just came in." At the sentencing hearing itself, moreover, the appellant lodged no objection to the receipt of the letter by the court. The appellant asked for no further time in order to respond to the contents of the letter.

In terms of timeliness of notice and of opportunity to respond, we note that although Rev. Dunn's letter to Judge Long was somewhat more detailed than was the summary of his statement to the Presentence Report investigator, the thrust of the criticism of the appellant was precisely the same. It added nothing really new. Whatever steps the appellant could have taken to reply or respond to the contents of the Presentence Investigation would have been precisely the steps called for by the letter to Judge Long. The appellant took no such steps, even when he was on timely notice with respect to the Presentence Investigation Report.

Quite aside from the fact that nothing has been preserved for appellate review, we see no error in the sentencing proceeding.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**